SHEPARD v. NORTHERN PAC. RY. CO. et al.

KENNEDY et al. v. GREAT NORTHERN RY. CO. et al.

JAMES v. SAME.

SHILLABER v. MINNEAPOLIS & ST. L. R. CO. et al.

(Circuit Court, D. Minnesota, Third Division. April 8, 1911.)

*(Syllabus by the Court.)*

**1.** COMMERCE (§§ 61, 62\*) — CONSTITUTIONAL LAW — CARRIERS — STATE RATES VIOLATIVE OF COMMERCIAL CLAUSE.

The acts of the Legislature of Minnesota of April 4, 1907 (Gen. Laws 1907, c. 97 [Rev. Laws Supp. 1909, §§ 2007—1 to 2007—2]), reducing passenger fares within the state about 33⅓ per cent., and of April 18, 1907 (Gen. Laws 1907, c. 232 [Rev. Laws Supp. 1909, §§ 2007—11 to 2007—17]), reducing commodity rates within the state about 7.37 per cent., and the orders of its Railroad and Warehouse Commission of September 6, 1906, reducing general merchandise rates within the state from 20 to 25 per cent., and of May 3, 1907, reducing in-rates within the state to distributing points, by their natural and necessary effect substantially burden and directly regulate interstate commerce, create undue and unjust discriminations between localities in Minnesota and those in adjoining states, violate the commercial clause of the Constitution (article 1, § 8), and are void.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 81–84, 89; Dec. Dig. §§ 61, 62.\*

Interference with interstate or foreign commerce, see note to McCanna & Fraser Co. v. Citizens' Trust & Surety Co. of Philadelphia, 24 C. C. A. 13.]

**2.** CONSTITUTIONAL LAW (§ 298\*)—DUE PROCESS OF LAW—RATES CONFISCATORY.

These acts and orders which prescribe maximum fares and rates, that bring from their respective Minnesota intrastate businesses to the Northern Pacific Company an annual net income of only 2.909 per cent., to the Great Northern Company an annual net income of only 3.359 per cent., and to the Minneapolis & St. Louis Company an annual net income of only 2.47 per cent., of the respective values of their Minnesota properties devoted to those businesses, prohibit a fair return upon these values, take the properties of the companies without just compensation, violate the fourteenth amendment to the Constitution, and are void.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.\*]

**3.** COMMERCE (§§ 5, 8\*) — CONSTITUTIONAL LAW—CARRIERS—RATES—NATIONAL POWER TO REGULATE INTERSTATE COMMERCE EXCLUSIVE AND PARAMOUNT.

The power to regulate commerce among the states was granted by the people to the nation in the Constitution, is exclusive, may be exercised to its utmost extent by the use of all means requisite to its complete exercise, and no state by virtue of its police power, or any other power it possesses, may restrict this grant or the plenary exercise of this power, for these inhere in the supreme law of the land and are paramount to the powers of the states.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 3, 5; Dec. Dig. §§ 5, 8.\*]

**4.** COMMERCE (§ 10\*)—RATES IN INTERSTATE COMMERCE NATIONAL AND FREE TO THE EXTENT NOT REGULATED BY THE NATION.

The fares and rates of transportation in interstate commerce are national in character, susceptible of uniform regulation, and so far as the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

nation has not regulated them are free from regulation by virtue of the commercial clause of the Constitution.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 8; Dec. Dig. § 10.*]

5. COMMERCE (§§ 7, 8, 12*)—CONSTITUTIONAL LAW—CARRIERS—RATES—LIMITS OF NATIONAL AND STATE POWER OF REGULATION.

The nation may regulate interstate fares and rates and all interstate commerce.

To the extent necessary completely and effectually to protect the freedom of, and to regulate, interstate commerce, but no farther, it may by its Congress and its courts affect and regulate intrastate commerce.

To the extent that it does not substantially burden or regulate interstate commerce, a state may regulate intrastate commerce and the fares and rates therein within its borders, but no farther. It may enforce regulations of intrastate commerce and its fares and rates which only incidentally or remotely affect interstate commerce. But state laws, orders, and regulations concerning intrastate commerce, or the fares or rates therein, which substantially burden or regulate interstate commerce, or the fares or rates therein, are beyond the powers of the state, unconstitutional, and void.

And where the attempted exercise of the power of a state to regulate intrastate commerce, or the attempted exercise of any of its other powers, impinges upon or conflicts with the constitutional power of the nation to protect the freedom of, and to regulate, interstate commerce and the fares and rates therein, the latter must prevail, because "that which is not supreme must yield to that which is supreme."

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 3, 5, 7, 9; Dec. Dig. §§ 7, 8, 12.*]

6. COMMERCE (§ 12*)—CONSTITUTIONAL LAW (§ 70*)—CARRIERS — RATES—EFFECT, NOT TERMS, OF STATE REGULATION, TEST OF SUBSTANTIAL BURDEN ON INTERSTATE COMMERCE.

The effect, and neither the terms nor the purpose, of state regulations, determines whether they substantially burden, or only incidentally or remotely affect, interstate commerce.

And this is a judicial question, which each court must decide on its own responsibility on the special facts of the case before it, and in the decision of which it "must obey the Constitution, rather than the lawmaking department of the government."

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 7, 9; Dec. Dig. § 12;* Constitutional Law, Cent. Dig. §§ 129–132; Dec. Dig. § 70.*]

7. COMMERCE (§ 7*)—RATES—DISCRIMINATING DIFFERENCES BETWEEN STATE AND INTERSTATE RATES FORBIDDEN BY INTERSTATE COMMERCE ACT.

The nation has the power to forbid, and by the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), it has prohibited, undue discriminations between localities in different states wrought by unreasonable differences between intrastate and legal interstate rates caused by the reduction of the former by the acts and orders of the officers of a state.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 3, 5; Dec. Dig. § 7.*]

8. COMMERCE (§§ 61, 62*) — CONSTITUTIONAL LAW — MINNESOTA INTRASTATE RATES IMPOSE UNCONSTITUTIONAL BURDENS ON INTERSTATE COMMERCE.

The facts considered, and *held:*

The unavoidable effect of the general and sweeping reductions of intrastate fares and rates in Minnesota, made by the acts and orders considered, was and is substantially to burden, directly to regulate, and to discriminate against the interstate commerce of the defendant companies, and to create undue and unjust discriminations between localities in

Minnesota and those in other states, in violation of the commercial clause of the Constitution.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 81–84, 89; Dec. Dig. §§ 61, 62.*]

**9.** CONSTITUTIONAL LAW (§ 298*)—CONFISCATORY RATES—JUST COMPENSATION ENTITLES TO A FAIR RETURN UPON VALUE OF PROPERTY USED.

The just compensation secured by the fourteenth amendment entitles the defendant railroad companies to a fair return upon the reasonable value of their property in Minnesota devoted to the public use of transportation. Such a return is just to the public as well as to the carriers.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.*]

**10.** CARRIERS (§ 18*)—CONFISCATORY RATES—VALUE OF RAILROAD PROPERTIES —COST OF REPRODUCTION NEW.

Under the evidence in these cases the cost of reproduction new of the Minnesota properties of the defendant companies devoted to the public use of transportation is more persuasive evidence of their values than the market value of their stocks and bonds, or the original cost of their acquisition and construction.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

**11.** CONSTITUTIONAL LAW (§ 48*)—CONFISCATORY RATES—REASONABLENESS— PRESUMPTION OF CORRECTNESS OF MASTER'S FINDINGS SUPERIOR TO PRESUMPTION OF REASONABLENESS.

Rate making looks to the future, and is a legislative function. Rate judging, determining whether or not rates made are confiscatory, is a judicial function.

There is a presumption in the first instance that Legislatures and commissions make reasonable and just rates, and clear proof is requisite to overcome it.

But when, after fares and rates have been tried by actual use for months, after plenary proof of their effect and other facts determinative of the issue confiscation vel non, has been made before a master learned in the law, who finds the facts, the legal or judicial presumption that his findings are just and right, while not conclusive, is superior to the original presumption that the rates were just and reasonable.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.*]

**12.** CARRIERS (§ 18*)—CONFISCATORY RATES—VALUATION—COST OF REPRODUCTION—INTEREST DURING CONSTRUCTION.

Interest on the cost of reproduction of railroad property at 4 per cent. per annum during one-half the time requisite to acquire and construct it is a necessary expense of reproduction and may be lawfully allowed as such.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

**13.** CARRIERS (§ 18*)—APPORTIONMENT OF VALUE—REVENUE BASIS MOST EQUITABLE.

Apportionment on the basis of revenue is the most reasonable and equitable method of assigning the value of railroad property in a state used for transportation to the various classes of its business, in order to determine the reasonableness of fares and rates.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

**14.** CARRIERS (§ 12*)—CONFISCATORY RATES—REASONABLENESS—FAIR RETURN IN MINNESOTA 7 PER CENT. PER ANNUM ON VALUE USED.

A net income of 7 per cent. per annum upon the value of railroad property in Minnesota devoted to the public use of transportation is not more than the fair return to which a railroad company is entitled under the fourteenth amendment to the Constitution.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Bills by one Shepard against the Northern Pacific Railway Company and others, by J. S. Kennedy and others and by H. A. James against the Great Northern Railway Company and others, and by W. Shillaber against the Minneapolis & St. Louis Railroad Company and others. Decrees for complainants.

See, also, 155 Fed. 445.

Jared How, Charles W. Bunn, Hale Holden, and Pierce Butler (Robert Thorne and William D. Mitchell, on the briefs), for complainants.

Edward T. Young and Edmund S. Durment (George T. Simpson, on the briefs), for defendants.

SANBORN, Circuit Judge. In the year 1906 the Northern Pacific Railway Company, the Great Northern Railway Company, and the Minneapolis & St. Louis Railroad Company were carrying passengers and freight within, through, and without the state of Minnesota for legal fares, rates, and charges which had been established, filed and published in accordance with the provisions of the act of Congress entitled "An act to regulate commerce," approved February 4, 1887 (24 Stat. 381, c. 104 [U. S. Comp. St. 1901, p. 3157]), and its amendments (U. S. Comp. St. Supp. 1909, pp. 1135, 1138, 1139), and these fares, rates, and charges were equable, relatively fair, and not discriminatory between interstate transportation and transportation within the state of Minnesota.

On September 6, 1906, the Railway and Warehouse Commission of the state of Minnesota by order directed a reduction of the maximum rates for the transportation of general merchandise within that state 20 to 25 per cent. below the fares and rates which these companies were then using, and on May 3, 1907, by a supplemental order it so reduced their in-rates to distributing points in the state that the reductions amounted in the case of the Northern Pacific Company to 13.58 per cent. On April 4, 1907, the Legislature of the state passed an act whereby it reduced maximum passenger fares within that state 33⅓ per cent. below the fares the companies were then using, and on April 18, 1907, it passed an act which reduced maximum commodity rates within the state 7.377 per cent. below the rates thereon in use by the companies. The laws of Minnesota required the companies, their officers and agents, to put these reductions in effect under severe and unconstitutional penalties. Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932; Gen. Laws Minn. 1907, c. 97 (Rev. Laws Supp. 1909, §§ 2007—1 to 2007—2); Gen. Laws 1907, c. 232 (Rev. Laws Supp. 1909, §§ 2007—11 to 2007—17); Rev. Laws Minn. 1905, § 1987. The companies made and have since maintained the prescribed reductions in the merchandise rates and the passenger fares, but at the suit of their stockholders this court temporarily enjoined them from reducing their commodity rates.

The complainants, stockholders respectively of these railroad companies, brought these suits against them and against the Attorney General and the members of the Railroad and Warehouse Commission of the state to prevent them from maintaining these fares and rates,

on the grounds (1) that the orders of the Commission and the acts of the Legislature described substantially burdened and regulated interstate commerce on the railroads of these companies, and (2) that their necessary effect was the confiscation of property of the companies. The cases were referred to Hon. Charles E. Otis as special master to hear and report the evidence, to find the facts, and to recommend forms of decrees. He has made a clear, concise, and exhaustive finding of the facts, has returned all the evidence to the court, and has recommended decrees for the complainants on both of the grounds they presented. Exceptions to his report have been argued, and the cases are here for decrees. In the discussion of the questions at issue the term "defendants" will be used to designate the Attorney General and the members of the Railroad and Warehouse Commission, because they alone actively assail the findings and recommendation of the master.

The first question for consideration is whether or not the orders of the Commission and the acts of the Legislature substantially burden interstate commerce, and the answer to this question must be drawn from an application of the facts which disclose their effect to the established rules of law which govern this subject.

These orders and acts by their terms relate to intrastate fares and rates only. Counsel for the defendants insist that in the police power of the state is vested plenary authority to make and enforce them because they relate to commerce within the state only, while the complainants argue that their enforcement is beyond the power of the state because the effect of their necessary operation is substantially to burden interstate commerce and hence to invade the exclusive domain of the nation, in violation of the commercial clause of the Constitution (article 1, § 8).

The principles and rules of law by which these orders and acts must be tried have been conclusively established by the decisions of the Supreme Court, and it will not be unprofitable to state them here again and to bear them constantly in mind during the consideration of the facts which must determine the issue here presented.

The power to regulate commerce among the states was carved out of the general sovereign power by the people when the national government was formed, and granted by the Constitution to the Congress of the nation. That grant is exclusive. The United States may exercise that power to its utmost extent, may use all means requisite to its complete exercise, and no state, by virtue of any power it possesses, either under the name of the police power or under any other name, may lawfully restrict or infringe this grant, or the plenary exercise of this power; for these are paramount to all the powers of the state and inhere in the supreme law of the land. The fares and rates of transportation of passengers and freight in interstate commerce are national in their character and susceptible of regulation by uniform rules. The silence or inaction of Congress relative to such a subject is a conclusive indication that it intends that the interstate commerce therein shall be free, so far as the Congress has not directly regulated it. Welton v. State of Missouri, 91 U. S. 275, 282, 23 L. Ed. 347; Brown v. Houston, 114 U. S. 622, 631, 5 Sup. Ct. 1091, 29 L. Ed. 257; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465, 485, 507, 8 Sup. Ct.

184 F.—49

689, 1062, 31 L. Ed. 700; Walling v. Michigan, 116 U. S. 446, 455, 456, 6 Sup. Ct. 454, 29 L. Ed. 691; Hall v. De Cuir, 95 U. S. 485, 490, 24 L. Ed. 547; Wabash, St. L. & P. R. Co. v. Illinois, 118 U. S. 557, 570, 573, 7 Sup. Ct. 4, 30 L. Ed. 244.

To the extent necessary completely and effectually to protect the freedom of and to regulate interstate commerce the nation by its Congress and its courts may affect and regulate intrastate commerce, but. no farther.

To the extent that it does not substantially burden or regulate interstate commerce a state may regulate the intrastate commerce within its borders, but no farther.

If the plenary power of the nation to protect the freedom of and to regulate interstate commerce and the attempted exercise by a state of its power to regulate intrastate commerce, or the attempted exercise of any of its other powers, impinge or conflict, the former must prevail and the latter must give way, because the Constitution and the acts of Congress passed in pursuance thereof are the supreme law of the land, and "that which is not supreme must yield to that which is supreme." Brown v. Maryland, 12 Wheat. 419, 448, 6 L. Ed. 678; Gibbons v. Ogden, 9 Wheat. 1, 209, 210, 6 L. Ed. 23; Wabash, St. L. & P. Ry. Co. v. Illinois, 118 U. S. 557, 573, 7 Sup. Ct. 4, 30 L. Ed. 244; Covington, etc., Bridge Co. v. Kentucky, 154 U. S. 204, 211, 212, 216, 217, 222, 14 Sup. Ct. 1087, 38 L. Ed. 962; Houston & T. C. R. Co. v. Mayes, 201 U. S. 321, 327, 328, 26 Sup. Ct. 491, 50 L. Ed. 772; Cleveland, C., C. & St. L. R. Co. v. Illinois, 177 U. S. 514, 517, 519, 521, 20 Sup. Ct. 722, 44 L. Ed. 868; Mississippi Railroad Commission v. Illinois Central R. Co., 203 U. S. 335, 343, 27 Sup. Ct. 90, 51 L. Ed. 209; Atlantic Coast Line R. Co. v. Wharton, 207 U. S. 328, 28 Sup. Ct. 121, 52 L. Ed. 230; Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 24, 27, 37, 30 Sup. Ct. 190, 54 L. Ed. 355; Ludwig v. Western Union Telegraph Co., 216 U. S. 146, 162, 30 Sup. Ct. 280, 54 L. Ed. 423; Pullman Company v. Kansas, 216 U. S. 56, 65, 30 Sup. Ct. 232, 54 L. Ed. 378; Hall v. De Cuir, 95 U. S. 485, 488–490, 497, 498–513, 24 L. Ed. 547; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; Welton v. Missouri, 91 U. S. 275, 280, 23 L. Ed. 347; Crutcher v. Kentucky, 141 U. S. 47, 57, 58, 59, 11 Sup. Ct. 851, 35 L. Ed. 649.

Thus a part of every interstate transportation is carried on within the state of its initiation and concluded within another state, but neither state may fix or regulate the fares or rates of the part within its borders, because the authority so to do is requisite to the complete preservation of the freedom of, and to the untrammeled regulation of, that transportation, and this power is vested exclusively in the nation. Wabash, etc., R. R. Co. v. Illinois, 118 U. S. 557, 575, 7 Sup. Ct. 4, 30 L. Ed. 244.

The nation and many states provide that carriers may not charge a higher rate for a short haul than for a long haul of like articles in the same direction under similar circumstances. But where the long haul is interstate, although the short haul is entirely within a single state, such a state may not enforce such a law for the same reason.

Louisville & Nashville R. Co. v. Eubank, 184 U. S. 27, 42, 43, 22 Sup. Ct. 277, 46 L. Ed. 416.

A state has the general power to prescribe the terms under which foreign corporations may carry on business within it, but any attempted exercise of that power by statute or otherwise in such a way as to prohibit or substantially to burden the interstate commerce of a foreign corporation within its borders is unconstitutional and void. Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 27, 37, 30 Sup. Ct. 190, 54 L. Ed. 355; Ludwig v. Western Union Telegraph Co., 216 U. S. 146, 162, 30 Sup. Ct. 280, 54 L. Ed. 423; Pullman Company v. Kansas, 216 U. S. 56, 65, 30 Sup. Ct. 232, 54 L. Ed. 378; Butler Bros. Shoe Co. v. United States Rubber Co., 156 Fed. 1, 6–11, 12, 13, 84 C. C. A. 167, 172, 177.

Subject to the constitutional limitation, which has been stated, a state may enact and enforce laws prescribing reasonable fares and rates for and otherwise regulating its intrastate commerce, although the operation of such laws remotely or incidentally affects interstate commerce, such as statutes regulating elevator charges (Munn v. Illinois, 94 U. S. 113, 135, 24 L. Ed. 77; Budd v. New York, 143 U. S. 517, 545, 12 Sup. Ct. 468, 36 L. Ed. 247); requiring track connections at a junction (Wisconsin, etc., R. R. Co. v. Jacobson, 179 U. S. 287, 21 Sup. Ct. 115, 45 L. Ed. 194); prohibiting the operation of freight trains on Sunday, regulating the liability of the initial carrier beyond its line (Richmond, etc., R. R. Co. v. Patterson Tobacco Co., 169 U. S. 311, 18 Sup. Ct. 335, 42 L. Ed. 759); requiring the reasonable stopping of passenger trains at stations (Lake Shore & Michigan South. Ry. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702; Gladson v. Minnesota, 166 U. S. 427, 431, 17 Sup. Ct. 627, 41 L. Ed. 1064); requiring telegraph companies to receive messages within a state and transmit them with reasonable diligence (Western Union Telegraph Co. v. James, 162 U. S. 650, 656, 16 Sup. Ct. 934, 40 L. Ed. 1105); excluding diseased cattle by means of a reasonable inspection law (Asbell v. State of Kansas, 209 U. S. 251, 256, 28 Sup. Ct. 485, 52 L. Ed. 778); requiring reasonable connections between trains of different companies (Atlantic Coast Line R. R. Co. v. North Carolina Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933); regulating reasonably the operation of passenger trains (Missouri Pacific Ry. Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472); requiring the transfer of cars to a mill near a crossing (Missouri Pacific Ry. Co. v. Larabee Mills Co., 211 U. S. 612, 620, 622, 29 Sup. Ct. 214, 53 L. Ed. 352); prohibiting the possession of game (New York ex rel. Silz v. Hesterberg, 211 U. S. 31, 40, 41, 29 Sup. Ct. 10, 53 L. Ed. 75); requiring locomotive engineers to be examined and licensed (Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508; Nashville, etc., Ry. Co. v. Alabama, 128 U. S. 96, 9 Sup. Ct. 28, 32 L. Ed. 352); requiring railway companies to fix their rates annually for the transportation of passengers and freights and to post a printed copy of such rates at their stations (Railroad Company v. Fuller, 17 Wall. 560, 21 L. Ed. 710); forbidding the consolidation of parallel or competing lines of railway (Louisville & Nashville R.

R. Co. v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849); regulating the heating of passenger cars and directing guards and guard posts to be placed on railroad bridges and trestles and the approaches thereto (New York, N. H. & H. R. R. Co. v. New York, 165 U. S. 628, 17 Sup. Ct. 418, 41 L. Ed. 853); providing that no contract made within the state shall exempt any railroad corporation from the liability of a common carrier or a carrier of passengers which would have existed if no contract had been made (Chicago, Milwaukee & St. Paul Ry. Co. v. Solan, 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 638); prescribing rates within the state on a single article, coal (Minneapolis & St. L. R. R. Co. v. Minnesota, 186 U. S. 257, 265, 22 Sup. Ct. 900, 46 L. Ed. 1151; Northern Pacific Ry. Co. v. North Dakota, 216 U. S. 579, 30 Sup. Ct. 423, 54 L. Ed. 624).

On the other hand, the laws of a state or the orders of its commissions relating to its intrastate commerce which by their necessary or natural or probable operation have the effect substantially to burden interstate commerce are beyond its powers, violative of the commercial clause of the Constitution, and void. Of this character are statutes imposing burdensome conditions on the landing of passengers from vessels employed in foreign commerce (Henderson v. Mayor of New York, etc., 92 U. S. 259, 268, 23 L. Ed. 543); requiring carriers engaged in interstate commerce to give all persons upon their public conveyances equal rights and privileges in all parts of those conveyances without discrimination or distinction on account of race or color (Hall v. De Cuir, 95 U. S. 485, 486, 488, 490, 24 L. Ed. 547); requiring telegraph companies to deliver dispatches by messenger to the persons to whom they are addressed so far as such a statute attempts to regulate the delivery of such dispatches at places in other states (Western Union Telegraph Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187); prohibiting a higher rate for a short haul entirely within the state than that charged for a longer interstate haul (Wabash, etc., Ry. Co. v. Illinois, 118 U. S. 557, 573, 7 Sup. Ct. 4, 30 L. Ed. 244); forbidding common carriers to bring intoxicating liquors into a state without a certificate that the consignee is authorized to sell such liquors in the county (Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700); prohibiting the sale in a state of fresh meats which have not been taken from animals inspected within the state within 24 hours before they are slaughtered (Minnesota v. Barber, 136 U. S. 313, 322, 329, 10 Sup. Ct. 862, 34 L. Ed. 455); prohibiting the sale of fresh meats from animals slaughtered 100 miles or more from the place at which they are offered for sale, unless they have been previously inspected by local inspectors (Brimmer v. Rebman, 138 U. S. 78, 81, 11 Sup. Ct. 213, 34 L. Ed. 862); prescribing tolls for the use of a bridge across a river between two states (Covington Bridge Co. v. Kentucky, 154 U. S. 204, 211, 212, 216, 217, 222, 14 Sup. Ct. 1087, 38 L. Ed. 962); requiring a railroad company engaged in interstate commerce to furnish an unreasonable number of cars to shippers in the state upon demand (Houston, etc., Ry. Co. v. Mayes, 201 U. S. 321, 327, 328, 26 Sup. Ct. 491, 50 L. Ed. 772); requiring such a company to stop

all its regular trains at county seats on its line (Cleveland, etc., Ry. Co. v. Illinois, 177 U. S. 514, 517, 519, 20 Sup. Ct. 722, 44 L. Ed. 868); requiring such a company to stop its through fast trains at a specified station in the state (Atlantic Coast Line R. R. Co. v. Wharton, 207 U. S. 328, 334, 337, 28 Sup. Ct. 121, 52 L. Ed. 230); levying a tax "equal to 1 per cent. of its gross receipts" on each railroad lying wholly within the state (Galveston, Harrisburg, etc., Ry. Co. v. Texas, 210 U. S. 217, 227, 28 Sup. Ct. 638, 52 L. Ed. 1031); and requiring foreign corporations to pay large fees as a condition of carrying on business entirely intrastate within a state, although by the orders of the charter board expressly leaving these corporations free to carry on interstate commerce in the state without any condition or restriction (Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 7, 26, 27, 30 Sup. Ct. 190, 54 L. Ed. 355; Pullman Company v. Kansas, 216 U. S. 56, 65, 30 Sup. Ct. 232, 54 L. Ed. 378; Ludwig v. Western Union Telegraph Co., 216 U. S. 146, 162, 163, 30 Sup. Ct. 280, 54 L. Ed. 423).

The acts of the Legislature of Minnesota and the orders of its commission are so general and so far reaching in their effect that there is no doubt that they unavoidably affect the interstate commerce of the companies. In the light of the rules and decisions reviewed, the question here at issue therefore becomes: Do these statutes and orders substantially burden or only incidentally or remotely affect the interstate commerce of the companies? This question, however, may not be answered by the words or terms of the laws and orders, or by a consideration of the intent or purpose of their makers alone. The touchstone to the true answer to the question and the test of the validity of the orders and statutes is their effect upon interstate commerce.

It is the effect, and not the terms or purpose, of state regulations of its local commerce, that determines whether or not they so substantially burden interstate commerce that they violate the commercial clause of the Constitution. And this is a judicial question which each court must determine on its own responsibility on the special facts of each particular case, and in the determination and decision of which it "must obey the Constitution rather than the lawmaking department of the government." Mugler v. Kansas, 123 U. S. 623, 661, 8 Sup. Ct. 273, 31 L. Ed. 205; Henderson v. Mayor of New York, 92 U. S. 259, 268, 23 L. Ed. 543; Minnesota v. Barber, 136 U. S. 313, 319, 330, 10 Sup. Ct. 862, 34 L. Ed. 455; Brimmer v. Rebman, 138 U. S. 78, 81, 11 Sup. Ct. 213, 34 L. Ed. 862; Cleveland, etc., Ry. Co. v. Illinois, 177 U. S. 514, 522, 20 Sup. Ct. 722, 44 L. Ed. 868; Louisville & Nashville R. R. Co. v. Eubank, 184 U. S. 27, 43, 22 Sup. Ct. 277, 46 L. Ed. 416; Galveston, Harrisburg, etc., Ry. Co. v. Texas, 210 U. S. 217, 227, 28 Sup. Ct. 638, 52 L. Ed. 1031; Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 24, 27, 30, 30 Sup. Ct. 190, 54 L. Ed. 355; Ludwig v. Western Union Telegraph Co., 216 U. S. 146, 162, 30 Sup. Ct. 280, 54 L. Ed. 423.

The counter proposition again presented in this case, that it is only where orders and statutes by their terms or by their construction by

state courts substantially or directly regulate interstate commerce, or where by their terms they disclose an intent of their makers so to do that they may be adjudged violative of the commercial clause, has been repeatedly urged upon the consideration of the Supreme Court in the cases just cited, and in many others only to be conclusively denied. In Galveston, Harrisburg, etc., Ry. Co. v. Texas, 210 U. S. 217, 227, 28 Sup. Ct. 638, 52 L. Ed. 1031, a case which involved a statute levying a tax upon a road entirely within the state which the court held to be a substantial burden upon interstate commerce and void, it said:

"Neither the state courts, nor the Legislatures, by giving the tax a particular name, or by the use of some form of words, can take away our duty to consider its nature and effect. If it bears upon commerce among the states so directly as to amount to a regulation in a relatively immediate way, it will not be saved by name or form."

Only last year in the Kansas cases (216 U. S. 1, 56, 30 Sup. Ct. 190, 54 L. Ed. 355), the Supreme Court again repudiated this contention. In those cases a statute of Kansas required of foreign corporations certain fees as a condition of permitting them to conduct intrastate business in that state. The Western Union Telegraph Company, which was carrying on both intrastate and interstate business in Kansas, applied for permission to continue its intrastate business, and the charter board of the state ordered that its application be granted only on condition that it pay the fee prescribed by the statute, and "that nothing herein contained shall apply to nor be construed as restricting in any wise the transaction by the said applicant of its interstate business, nor its business for the federal government, but that this grant of authority and requirement as to payment relates only to the business transacted wholly within the state of Kansas." The officers of the state insisted that this statute and this order were valid because by their express terms they excluded interstate business, applied to intrastate business alone, and disclosed a clear purpose and intent of the Legislature and the board not to obstruct or embarrass interstate commerce in any way. But the Supreme Court reviewed several of its earlier decisions upon this subject, held the statute and the order unconstitutional, and, among other things, said:

"But the disavowal by the state of any purpose to burden interstate commerce cannot conclude the question as to the fact of such a burden being imposed, or as to the unconstitutionality of the statute as shown by its necessary operation upon interstate commerce. If the statute, reasonably interpreted, either directly or by its necessary operation burdens interstate commerce, it must be adjudged to be invalid, whatever may have been the purpose for which it was enacted, and although the company may do both interstate and local business. This court has repeatedly adjudged that in all such matters the judiciary will not regard mere forms, but will look through forms to the substance of things." 216 U. S. 1, 27, 30 Sup. Ct. 190, 197, 54 L. Ed. 355.

And Mr. Justice White in the Pullman Company's Case, 216 U. S., at page 65, 30 Sup. Ct., at page 236 (54 L. Ed. 378), which involved the same statute, said that one of the propositions conclusively established by previous decisions of the court was that:

"Even though a power exerted by a state, when inherently considered, may not in and of itself abstractly impose a direct burden on interstate commerce,

nevertheless such exertion will be a direct burden on such commerce if the power as exercised operates a discrimination against that commerce, or, what is equivalent thereto. discriminates against the right to carry it on."

And Mr. Justice Harlan in Ludwig v. Western Union Telegraph Co., 216 U. S., at page 162, 30 Sup. Ct., at page 285 (54 L. Ed. 423), discussing a similar statute of Arkansas, said:

"According to well-settled rules of statutory construction, the validity of a statute, whatever its language, must be determined by its effect or operation, as manifested by the natural and reasonable meaning of the words employed. Henderson v. Mayor of New York, 92 U. S. 259, 268 [23 L. Ed. 543]. If a statute by its necessary operation really and substantially burdens the interstate business of a foreign corporation seeking to do business in a state, or imposes a tax on its property outside of such state, then it is unconstitutional and void, although the state Legislature may not have intended to enact an invalid statute."

Here, then, is the decisive question upon this branch of these cases. Is the effect of the statutes and orders assailed substantially to burden the interstate commerce of the companies? And we turn to the facts of this case for the answer.

The Northern Pacific Railway Company is a corporation and a common carrier that on June 30, 1906, owned and was operating 7,694 miles of railroad track, of which 1,625 miles are in the state of Minnesota. Its main line extends from Superior, Wis., and Duluth, Minn., which sit side by side at the westerly end of Lake Superior, St. Paul, and Minneapolis, Minn., westerly through North Dakota, Montana, Idaho, Washington, and Oregon, to Seattle, Tacoma, and Portland on the Pacific Coast. From Duluth to other points in Minnesota reached by it the company has an interstate line passing through Wisconsin and a local line that joins the interstate line at Carlton, 20 miles westerly from Duluth. Its main line crosses the western line of Minnesota at Moorhead, Minn., and Fargo, N. D., 250 miles from St. Paul. It has two branch lines, which cross the western line of the state at East Grand Forks, Minn., and Grand Forks, N. D., 320 miles from St. Paul, and at Breckenridge, Minn., and Wahpeton, N. D., 237 miles from St. Paul, respectively.

The Great Northern Railway Company is a corporation and a common carrier that owned and was operating lines of railway comprehending on June 30, 1906, 8,528 miles of track, of which 2,779 miles are in Minnesota. Its main lines extend from Superior, Wis., and Duluth, Minn., in a westerly direction through the states of Wisconsin, Minnesota, North Dakota, Montana, Idaho, Washington, and Oregon, to the cities of Seattle and Portland. Its line between Duluth, Minn., and other points in Minnesota reached by it, passes through the state of Wisconsin. It has five lines of railway which cross the western line of Minnesota and extend westerly into or through other states, one from Minneapolis by way of Willmar, which crosses at Breckenridge, Minn., and Wahpeton, N. D., 214 miles from St. Paul; one from Minneapolis by way of Barnesville, which crosses at Moorhead, Minn., and Fargo, N. D., 241 miles from St. Paul; one from Duluth by way of Crookston, which crosses at East Grand Forks, Minn., and Grand Forks, N. D., 296 miles from Duluth; one which leaves the Willmar main line at Benson and crosses the Minnesota line at

Nassau, 173 miles from St. Paul; one which leaves the main line at Willmar and crosses the Minnesota line at Jasper, Minn., 218 miles from St. Paul; and it also has a branch line wholly within the state of Minnesota, which leaves the main line at Barnesville and extends northerly to Noyes, 391 miles from St. Paul.

The Minneapolis & St. Louis Railroad Company is a corporation and a common carrier that owned and operated lines of railroad comprehending on the 30th day of June, 1906, 632 miles of track, and that operated by means of leases or trackage rights 396 miles of track. Its main line extends from St. Paul and Minneapolis, Minn., westerly by way of Winthrop, Minn., to Lebeau, S. D., from St. Paul and Minneapolis, southwesterly by way of Winthrop, Minn., to Storm Lake, Iowa, and from St. Paul and Minneapolis, southerly by way of Albert Lea, Minn., to Des Moines, Iowa.

The whole railroad properties of each of these companies has constituted and still constitutes a single system, and has been and is operated by each of the said companies as such. The cars, engines, and supplies of each company customarily have been and are used upon its system without regard to whether the business in which they have been or are employed has been or is interstate business or business local to a state. Each of said companies customarily has carried and does carry interstate passengers and passengers local to the state on the same train and in the same car, and interstate freight and freight local to a state on the same train, and, if less than car load freight, in the same car. There has never been any separation, and it is impracticable in the exercise of any fair economy to make and maintain any separation in the business of transporting interstate passengers and passengers local to the state, or between interstate freight and freight local to a state.

By far the larger proportion of the business of each of these companies is interstate, and by far the larger proportion of the business of each of these companies within the state of Minnesota is interstate. In the year 1906 the freight business of the Northern Pacific Company local to Minnesota was 2.67 per cent. of its entire freight business and 12.33 per cent. of its freight business touching the state, and its passenger business local to the state was 5.79 per cent. of its entire passenger business and 67.21 per cent. of its passenger business touching the state.

The conditions attending the transportation of passengers and of freight have been and are substantially the same for like distances within those portions of the states of Wisconsin, Minnesota, North Dakota, and South Dakota reached by the lines of railway operated by either of these companies, whether such transportation has been or is a business local to a state or interstate between any or all of these states.

Prior to the orders and acts here in question the fares and rates in force upon these lines of railway for the transportation of passengers and freight were lawful, for they had been adopted in accordance with the provisions of the act of Congress, were relatively fair, and were not discriminatory between interstate business and business local to any state.

Any substantial change in the basis of rates thus established and in force, or in any particular rate, due only to the fact that the transportation was interstate, or that it was local to a state, would have been actual, undue, and unjust discrimination in fact and any substantial difference in rates for the transportation of passengers, merchandise, or commodities maintained by either of said companies as between traffic local to the state and traffic which goes between the state of Minnesota and either of its neighboring states will constitute actual, undue, and unjust discrimination in fact.

Substantially all commodities and property which are the subject of transportation are classified and arranged in 10 groups with reference to their general character and value, and the cost of transportation thereof and this classification with modifications from time to time made therein has long been used by carriers in the West and Northwest as a basis for fixing rates. Commodities of each class take the same rate under like conditions, and this classification is called the "Western classification." In Minnesota, however, many commodities amounting to several hundred have by the action of the Minnesota Commission been removed from this Western classification, and given special rates, which are called "commodity rates," or have been reduced in class, so that the Western classification in Minnesota is in many respects different from the Western classification in general use. The Commission by its order made on September 6, 1906, prescribed a schedule of maximum rates for the transportation within the state of Minnesota of articles covered by this Western classification as modified by the intervention of the Commission, and required the railway companies to observe these rates. This schedule was such that each rate for each class for any distance bore such an exact relation to each other rate that, given one rate out of the schedule, any other rate could be ascertained by mathematical calculation, and without reference to the schedule itself. This is the plan of the schedule.

For first-class merchandise an allowance of 11.2 cents per cwt. is made for terminal charges, and for each five miles or fraction thereof up to 200 miles .98 of a cent for hauling charge, so that for a distance of five miles the rate is 12 cents per cwt., for a distance of 10 miles the rate is 12.98 cents per cwt., and for a distance of 200 miles the rate is 50.22 cents per cwt. After a distance of 200 miles is reached, .98 of a cent is allowed per cwt. as a hauling charge for each 10 miles or fraction thereof up to 400 miles, so that, the rate for 200 miles being 50.22 cents per cwt., the rate for 210 miles is 51.20 cents, for 220 miles the rate is 52.18 cents, and for 400 miles the rate is 69.82 cents per cwt. After a distance of 400 miles is reached, .98 of a cent is allowed as a hauling charge per cwt. for each 20 miles or fraction thereof up to 500 miles; so that, the rate for 400 miles being 69.82 cents per cwt., the rate for 420 miles is 70.80 cents, and the rate for 500 miles is 74.72 cents per cwt. There are 10 classes of merchandise provided for in this schedule. The rates for classes other than the first class are a fixed per centum of the corresponding rates for the first class, those for the second class being 83⅓ per cent., for the third class being 66⅔ per cent., for the fourth class being 50 per cent., for the fifth class being 40 per cent., for class

A being 45 per cent., for class B being 35 per cent., for class C being 30 per cent., for class D being 25 per cent., and for class E being 20 per cent. The rates thus prescribed are maximum terminal rates, and may be increased by 5 per centum for shipments between stations, neither of which is a terminal or a distributing station. The reduction in merchandise rates made by this order of September 6, 1906, was from 20 per cent. to 25 per cent. of the rates theretofore in force. Notwithstanding the extent of this reduction, all the railway companies interested put the rates prescribed by this order into effect on November 15, 1906, and they have ever since been, and still are, maintained by all the companies concerned as maximum rates for the transportation within the state of merchandise covered by the order.

On May 3, 1907, the Commission made an order supplemental to that of September 6, 1906, for the purpose of securing more favorable in-rates to a number of jobbing centers in the state of Minnesota other than St. Paul, Minneapolis, and Duluth. This order had the effect to substantially reduce the previously existing rates to the extent in the case of the Northern Pacific Company of 13.577 per cent. Nevertheless, the railroad companies put in force and have since maintained the rates prescribed by this supplemental order.

The rates prescribed for the articles specified in this Western classification as modified are called "merchandise rates."

By chapter 232 of the Laws of Minnesota 1907, approved April 18, 1907, the Legislature of Minnesota created seven new classes of commodities numbered 11 to 17. Wheat and 13 other articles were placed in class 11, corn and 37 other articles in class 12, lumber and 5 other articles in class 13, sheep in double-decked cars and cattle in class 14, sheep in single-decked cars and hogs in class 15, hard coal in class 16, and soft coal in class 17; and it prescribed and required the companies to observe maximum rates for the transportation of these articles in Minnesota which were on the average 7.37 per cent. below those then lawfully in force, and the rates on grain and coal that were then in force on the Northern Pacific and Great Northern lines had been reduced by those companies in the preceding September and October about 10 per cent. These rates are called "commodity rates" and the companies, in view of the severe penalties denounced for a failure to comply with the act, were about to put them in force when they were enjoined at the suit of the complainants.

By chapter 97 of the Laws of Minnesota 1907, the Legislature prescribed and required the companies to observe maximum rates of 2 cents a mile for passengers over, and 1 cent a mile for passengers under, 12 years of age for the transportation of such passengers within the state of Minnesota. This law required a reduction of 33⅓ per cent. of the then established lawful rates, and the companies, in view of the severe penalties prescribed for a violation of this law, put these rates in force and have since maintained them.

The average reduction of fares and rates required by these orders and acts were:

(1) On general merchandise 20 per cent. to 25 per cent. by the order of September 6, 1906.

(2) In in-rates to distributing stations amounting in the Northern Pacific case to 13.58 per cent.

(3) In maximum rates on grain, lumber, live stock, coal, etc., 7.-377 per cent.

(4) In maximum rates on passengers 33⅓ per cent.

Superior, Wis., and Duluth, Minn., are situated side by side at the western extremity of Lake Superior. Each is an important business center. Conditions attending transportation to and from either of them are the same as to or from the other. The railroad companies reaching them have always accorded them and do accord them like rates in and out. They ship and receive the same kinds of freight and to and from the same localities. Any substantial difference in the rates accorded them would destroy the commerce of the city given the higher rates. The propriety of a parity of rates to and from these localities has always been recognized.

For the same reasons, each of the couples of cities composed of Grand Forks, N. D., and East Grand Forks, Minn., Fargo, N. D., and Moorhead, Minn., and Wahpeton, N. D., and Breckenridge, Minn., have always been accorded by the railway companies serving them like rates in and out. The cities in each pair depend upon the same carriers, have substantially the same producing and consuming markets, and receive and ship the same kinds of articles. Any substantial difference in rates as between the cities composing each pair would seriously damage, if not wholly destroy, the commerce of the city given the higher rate, and would be an undue and unjust preference and advantage in fact for its neighboring city.

Failure by the Northern Pacific Company to maintain substantially as low rates between Superior and points in Minnesota as between Duluth and other points in Minnesota would seriously impair the power of the company to transact its interstate business between Superior and points in Minnesota, and would seriously depreciate the value of the company's property in Superior.

## Merchandise Rates.

The schedule comprehended within the order of September 6, 1906, prescribed maximum rates for transportation within the state of Minnesota which were from 20 per cent. to 25 per cent. lower than those theretofore established by the Northern Pacific and Great Northern Companies and maintained by them up to the time of the taking effect of the order for transportation in Wisconsin, Minnesota, and North Dakota, regardless of whether such transportation was local to either state or interstate between any two of them. If these companies after the installation of the rates prescribed by the order for transportation within Minnesota had continued to maintain the former rates for transportation between Minnesota and an adjoining state, the result would have been serious discrimination against localities in the neighboring states.

For example, prior to the taking effect of the order, the rate maintained by the Northern Pacific on a 200-pound barrel of flour (fourth class) from Minneapolis to Fargo was 68 cents. The schedule fixed

54.2 cents as a maximum from Minneapolis to Moorhead. This is a fair example of the difference between the former interstate rates for transportation between Minnesota and an adjoining state and the rates prescribed by the order for transportation within the state.

On the same day that the Northern Pacific Company installed its rates in Minnesota as prescribed by the order, it reduced its interstate rates between Superior and points in Minnesota to an exact parity with its rates between Duluth and other points in Minnesota, its interstate rates between Grand Forks, Fargo, and Wahpeton, N. D., and Minnesota points to an exact parity with its rates between East Grand Forks, Moorhead, and Breckenridge, respectively, and other Minnesota points, and its interstate rates between Superior and Grand Forks, Fargo, and Wahpeton, respectively, to an exact parity with its state rates between Duluth and East Grand Forks, Moorhead, and Breckenridge, respectively. The reduction was substantial. For example, the reduction in the rate on first class from Superior to Fargo was from 65 cents per cwt. to 54.1 cents per cwt., and on fifth class from 27 cents per cwt. to 21.7 cents per cwt.

These reductions were compelled by the necessary and direct effect of the operation of the order. Had they not been made, Superior could not have competed in business in Minnesota with Duluth, Fargo, Grand Forks, and Wahpeton could not have competed with Moorhead, East Grand Forks, and Breckenridge, respectively, nor could Superior have transacted business successfully with Fargo, Grand Forks, or Wahpeton. Moreover, although the Northern Pacific suffered a substantial loss in revenue from its interstate business, it had the choice of submitting to that loss or of suffering substantial destruction of its interstate commerce in articles covered by the order between these localities.

On the same day that the Northern Pacific made these reductions in its interstate rates the Great Northern made similar reductions, although its business between Duluth and Minnesota points is interstate. The reason for its reductions from Duluth was to preserve the relation in rates from Duluth which had always existed between localities on the Great Northern and localities similarly circumstanced on the Northern Pacific, and also to meet the reduced rates on the Northern Pacific line.

Moorhead, Minn., Fargo and Bismarck, N. D., Billings and Butte, Mont., are so-called "jobbing centers." Prior to the taking effect of the order of September 6, 1906, they had always been accorded rates by the Northern Pacific Company which would allow them to compete in distribution of merchandise with their nearest neighbors and with St. Paul and Minneapolis and Duluth. The sum of car load rates from St. Paul, Minneapolis, and Duluth to these centers and the less than car load rates out from these centers to the territory geographically tributary to them, respectively, had been such as to compare favorably with rates in and out of their local competitors as well as with less than car load rates from St. Paul, Minneapolis, and Duluth into the territory geographically served by them, respectively. The order of September 6, 1906, as supplemented by the order of May 3, 1907, substantially reduced car load rates from Duluth, St. Paul, and Minneapolis to Moorhead. This reduction would have given Moorhead a

substantial advantage in territory accessible to its jobbing industry, not only as against Fargo unless car load rates to Fargo should have been similarly reduced, but also as against Duluth, St. Paul, and Minneapolis unless less than car load rates from these points to points geographically accessible to Moorhead, which included a considerable territory in North Dakota, should have been proportionately reduced. This reduction, unless accompanied by a corresponding reduction in car load rates to Fargo from the eastern terminals, would have served to build up Moorhead at the expense of Fargo, and therefore to discriminate unduly and unjustly against Fargo as a matter of fact, and would destroy the relation in rates which had theretofore existed between the sum of car load rates into Moorhead and less than car load distributing rates out on the one hand, and less than car load distributing rates from Duluth, St. Paul, and Minneapolis to localities accessible to Moorhead on the other. If Fargo were protected as against Moorhead by a like reduction in car load rates, it would have an advantage and preference over Bismarck in territory common to them both and an advantage over the eastern terminals in territory common to Fargo and them, unless car load rates from the eastern terminals to Bismarck and less than car load rates from the eastern terminals to the territory accessible to Fargo should be correspondingly reduced; and this advantage would constitute an undue and unjust preference to Fargo as against Bismarck, which competes in certain territory with Fargo, unless rates on car load lots from the eastern terminals to Bismarck should be correspondingly reduced. And so on, from distributing point to distributing point.

Every rate comprehends two terminal charges, the initial and the final, and a distance haulage charge. It is a cardinal principle of rate making that a rate for a longer distance should be proportionately smaller than one for a shorter distance; that is to say, that a rate for 500 miles should be less than twice the rate for 250 miles, if conditions of transportation be the same, because the rate for 250 miles includes two terminal charges, and, if the rate for 500 miles were twice the rate for 250 miles, it would manifestly include the equivalent of four terminal charges. Even if the haulage charge were the same per mile for a haul of 500 miles as for a haul of 250 miles, which is contrary to the rule generally applied in rate making, the rate per ton per mile for the 500 miles should be less than for the 250 miles because in the one case the terminal charges would be spread over 500 miles and in the other over only 250 miles.

Comparison of rates at present maintained by the Northern Pacific Company from St. Paul to various stations in North Dakota and Montana with those established by the order of September 6, 1906, and now maintained by the company between St. Paul and Moorhead, discloses that the Commission-made rates from St. Paul to Moorhead are in general substantially less than the proportion of the presently maintained interstate rates of the company to these various points in North Dakota and Montana, based on the mileage in Minnesota as compared to that of the entire haul. For example, the present rate maintained by the Northern Pacific on class E, merchandise from St. Paul to Miles City, 743 miles from St. Paul, is 39 cents per cwt. The rate to Moor-

head, based on the proportion of 39 cents, which the mileage of the haul in Minnesota is of the entire haul, is 13 cents. The order allows only 11 cents per cwt. from St. Paul to Moorhead, in which, of course, are included two full terminal charges. Maintaining rates, comparison of which shows this result, involves substantial, undue, and unjust discrimination in fact against the interstate localities. And a reduction of the interstate rates compelled by the reduction of the state rates substantially burdens interstate commerce and restricts its freedom.

After the installation by the Great Northern and the Northern Pacific companies of the rates prescribed by the order of September 6, 1906, it appeared that the sum of the locals from St. Paul to Moorhead and from Moorhead to many points in North Dakota was less than the theretofore established and maintained interstate rates from St. Paul to these points in North Dakota. Both companies thereupon established and now maintain rates from St. Paul to these North Dakota points as a rule no greater than the sum of the locals on Moorhead, but which are substantially lower in general than the interstate rates maintained by them at the time of the taking effect of the order. Maintaining interstate rates from St.' Paul to North Dakota localities substantially greater than the sum of the locals based on the state line would have involved undue and unjust discrimination in fact.

As a matter of fact, the reasons for such reduction were to prevent transshipment at Moorhead in order to take advantage of the lower sum of the locals; to retain on its line traffic which was liable to reach Moorhead over other lines by reason of competition; and, as to less than car load lots, to enable jobbers in the Twin Cities and Duluth to compete with Moorhead and Fargo in territory which otherwise the latter would have exclusively occupied by reason of their closer proximity thereto.

It is one of the fundamental dogmas of rate making that the haulage charge per mile shall not increase with increasing distance, if conditions be the same. The order of September 6, 1906, promulgates a schedule which for first-class merchandise, for example, allows a terminal charge of 11.02 cents per cwt. and a haulage charge of .98 cent per 5 miles up to 200 miles, then a haulage charge of .98 cent per 10 miles for added distance up to 400 miles, and then a haulage charge of .98 cent per 20 miles up to 500 miles—the limit of distance covered by the order. Both the terminal charge and the haulage charge allowed for the other merchandise classes are a fixed percentage of those allowed for first. Under this schedule, a hundred pounds of merchandise transported by the Northern Pacific from St. Paul to Moorhead, 248 miles, has been hauled for 48 miles, at the rate of .98 cent per 10 miles when Moorhead is reached. If this same haulage charge of .98 cent per 10 miles be applied for the remaining distance of the haul from St. Paul to Spokane, Wash., 1,510 miles from St. Paul (which is taken as a fair example merely for the illustration of this principle), it would produce a rate from St. Paul to Spokane on first-class merchandise of $1.79 per cwt. The Interstate Commerce Commission in the Spokane Rate Case has fixed the reasonable rate on first-class merchandise from St. Paul to Spokane of $2.50. Maintaining this rate from St. Paul to Spokane and the Commission's schedule in Min-

nesota at the same time necessarily involves the raising of the per mile haulage charge after the Minnesota state line has been crossed, or the charging a higher rate within Minnesota for its mileage proportion of long haul interstate business than for business local to the state carried on over the same rails and under the same conditions, and involves necessarily undue and unjust discrimination in fact against localities westerly of the Minnesota-North Dakota boundary line.

For more than 25 years the Northern Pacific Company has maintained an equal basis of rates on merchandise between its eastern terminals and Butte and its western terminals and Butte, and between its eastern terminals and localities intermediate between them and Butte, and between its western terminals and localities intermediate between them and Butte. Other railroads reaching Butte have during the same time maintained like rates to Butte from Sioux City, Omaha, St. Joseph, and Kansas City on the east, and from San Francisco, Sacramento, and Los Angeles on the west. Butte has been as the hub of a wheel, with spokes representing equal rates to these various cities. Industries have been born and have grown in reliance upon this parity of rates. Intermediate points have had rates fixed in proportion with the Butte rates. Competition of markets and of carriers has brought this about. The Northern Pacific Company cannot maintain its present Commission-made rates between its eastern terminals and Moorhead, and at the same time its present interstate rates from its eastern terminals to Butte without substantial discrimination in fact against Butte or localities intermediate between its eastern terminals and Butte. If it lowers its rates from its eastern terminals to Butte and intermediate stations to such an extent as to obviate substantial discrimination in fact, it must, to preserve the relation which has always existed, lower to a like extent its rates from its western terminals to Butte and intermediate stations. If, then, the Northern Pacific maintains the Commission-made rates between its eastern terminals and Moorhead, it must either substantially discriminate in fact or destroy the general relation of rates which has existed for many years in the territory between the Missouri river and the Pacific Coast. In this way the reduction of the rates in Minnesota either imposes a substantial burden upon, and a regulation of, interstate commerce or compels unjust discrimination therein.

Prior to the taking effect of the order of September 6, 1906, the Great Northern and Northern Pacific Companies had established joint through rates in connection with other carriers from all localities easterly or southerly of the state of Minnesota to all points in Minnesota westerly of St. Paul and Minneapolis reached by them, respectively, and these rates were in force at the time of the taking effect of the order. After the rates prescribed by the order were installed, the sum of the locals on St. Paul from all localities southerly and easterly of Minnesota to all localities in Minnesota westerly of St. Paul and Minneapolis reached by these companies was substantially less than the then existing interstate rates between such localities southerly or easterly of Minnesota and such Minnesota localities. Maintaining such a relation of rates would have involved undue and unjust discrimination in fact against the localities easterly and southerly of Minne-

sota and an unjust and undue preference and advantage in fact for St. Paul, because merchandise could have been shipped from all localities easterly and southerly of Minnesota to St. Paul on the theretofore established and then existing interstate rates and distributed from St. Paul to all points westerly of St. Paul and Minneapolis on the rates prescribed by the order for substantially less charges in the aggregate than would have been incurred for the through haul under the then existing through interstate rates. In order to avoid this discrimination, the companies forthwith, after the taking effect of the order, withdrew the then existing interstate rates, and established a new tariff of through rates which were no higher than the sum of the locals on St. Paul. For example, the former through rates from Chicago to Wadena, Minn., on first-class merchandise, was $1.09 per cwt. The sum of the locals on St. Paul after the taking effect of the order was $1.004. The present through rate is $1.004, being a reduction of 8.6 cents per cwt. In other words, the reduction in the Minnesota rates compelled an unjust discrimination in interstate rates, or submission to the imposition of a substantial burden on interstate commerce.

Conditions attending transportation are substantially the same in Minnesota and North Dakota, whether the transportation is local to either state or interstate between them. If unjust and undue preference or advantage in rates is to be avoided, like rates must exist for like distances under like circumstances. The Northern Pacific and Great Northern Companies have prior to the taking effect of the order maintained an equable basis of rates in the territory which these two states compose without regard to state lines. For example, the interstate rates from Moorhead, Minn., westerly into North Dakota, have been the same as from Moorhead easterly into Minnesota, and no conditions have existed, or do exist, which justify a different basis of rates for east-bound to that for west-bound transportation.

Prior to the installation of the rates prescribed by the order, the rate per cwt. of first-class merchandise for 100 miles, for example, out of Moorhead, whether westerly, into North Dakota or easterly, into Minnesota, was 43 cents. For transportation westwardly into North Dakota this rate from Moorhead still exists. The rate prescribed by the order and now in effect from Moorhead eastwardly into Minnesota is per cwt. of first-class merchandise 30.6 cents. This disparity of rates for transportation under substantially similar conditions, and which disparity increases as distance easterly from Moorhead increases, constitutes an undue preference and advantage to the eastwardly localities in Minnesota, and a corresponding prejudice and disadvantage to the interstate westwardly localities in North Dakota. If the companies maintaining this relation of rates, unfair in fact, are to continue to maintain the rates prescribed by the order, they can remove the existing undue and unjust discrimination in fact against the interstate localities in North Dakota only by reducing the interstate rates from Moorhead to localities in North Dakota to a substantial parity with those maintained from Moorhead to localities at like distance in Minnesota.

The Great Northern Company owns and operates a branch line to Noyes, 391 miles from St. Paul. The line between St. Paul and Noyes

is wholly within the state of Minnesota. Conditions attending transportation of merchandise from St. Paul to Noyes are at least no more favorable than those attending transportation from St. Paul to localities in North Dakota on the main line of the company and equally distant from St. Paul. All that is claimed by complainants is that conditions are substantially alike. Prior to the taking effect of the order, the rate per cwt. of first-class merchandise for transportation on the Great Northern from St. Paul to a locality 390 miles distant and situate either in Minnesota or in North Dakota was 96 cents. The Commission-made rate from St. Paul to Noyes is 68.8 cents. Such a disparity in rates without substantial dissimilarity in conditions constitutes undue and unjust discrimination in fact.

The order of September 6, 1906, prescribes a basis of rate making. Its schedule is framed to secure a fixed relation between rates on the same class for different distances, a fixed relation between rates for the different classes for the same distance, and therefore manifestly a fixed relation between rates for different classes for different distances. These relations are so stable that, given the rate for any distance on any class, the rate for any other distance on any other class may be determined by one who knows the method upon which the schedule is constructed. An avowed purpose of the schedule is to secure equality of rates.

The Great Northern Company operates a line from St. Paul to Sioux City, Iowa, 327 miles from St. Paul, which leaves the state of Minnesota and enters the state of South Dakota at a distance approximately 218 miles from St. Paul—the distance from St. Paul to Jasper, the border Minnesota town.

It operates another line from St. Paul to Huron, S. D., 294 miles from St. Paul, which leaves the state of Minnesota and enters the state of South Dakota at a distance approximately 173 miles from St. Paul —the distance from St. Paul to Nassau, the border Minnesota town. Between St. Paul and Willmar, Minn., 102 miles from St. Paul, these lines are identical.

Under the schedule prescribed in the order, the progression of the rate—the haulage charge with increasing distance—breaks in two at a distance of 200 miles. That is to say, the haulage charge for first class (and for other classes in fixed relation) having been allowed at .98 cent for each five miles up to 200 miles is cut to .98 cent for each 10 miles beyond 200 miles, and up to 400 miles.

When the line between Minnesota and South Dakota is reached on the St. Paul-Sioux City line, the progression of the rate prescribed by the schedule is .98 cent per 10 miles for first class.

When the line between Minnesota and South Dakota is reached on the St. Paul-Huron line, the progression of the rate is .98 cent per five miles of haul.

It is apparent that, unless undue and unjust discrimination shall exist in the rates on one of these interstate lines as compared with the other, the same basis of making the rate, the same relation between rates for different distances and different classes must be maintained on one line as on the other, and that, notwithstanding that the 200-mile

point of distance on the St. Paul-Huron line is within the state of South Dakota, the progression of the rate should break in two as it has on the St. Paul-Sioux City line on which that point was reached, and that break was made within the state of Minnesota.

The schedule prescribes fixed relations between rates for different distances and different classes. If the relation must be adhered to within the state of Minnesota, it cannot be departed from substantially merely because of the intervention of a state line at one distance or another without involving undue and unjust discrimination in fact in rates.

Since the taking effect of the order of September 6, 1906, both the Great Northern and the Northern Pacific Companies have reduced their interstate rates on merchandise from their eastern terminals in Wisconsin and Minnesota to all localities in general in North Dakota. Such reductions have been made as a rule only to such extent as was necessary to remedy the discrimination resulting from the fact that the sum of the local rates from the eastern terminals to the border towns of Minnesota and from such border towns to the several localities in North Dakota was less than the theretofore established and then existing through interstate rates from the eastern terminals to the several respective localities in North Dakota, and not to such extent as to remedy the discrimination resulting from the fact that in most cases the general basis of rates on merchandise for traffic within Minnesota is substantially lower than that maintained in North Dakota or for traffic crossing the line between North Dakota and Minnesota notwithstanding the substantial equality of conditions. Such substantially lower basis of rates for transportation of merchandise within Minnesota than for that within North Dakota or for that between the two states still exists, and constitutes undue and unjust discrimination in fact.

St. Cloud, Minn., is on the Barnesville main line of the Great Northern, and is 168 miles easterly from Moorhead, at which point this line leaves the state of Minnesota and enters the state of North Dakota. Fergus Falls, Minn., is on the same line, 56 miles easterly from Moorhead. They are each distributing centers, so declared by the Commission's order of May 3, 1907. Whether discrimination, in fact, exists between rates is determined by comparison of the rates involved. If conditions are substantially the same, rates for like distances should be the same, and, if not the same, undue and unjust discrimination in fact will exist. Conditions are substantially alike so far as transportation goes for a distance on the Great Northern of 168 miles westerly of Fergus Falls as for the same distance westerly of St. Cloud. Because they are distributing centers, rates from Fergus Falls to points within that distance westerly should be the same as from St. Cloud to points of equal distance westerly. Rates on articles covered by the order of September 6, 1906, from St. Cloud westerly within such distance of 168 miles, are substantially lower than those maintained by the Great Northern to points in North Dakota of like distance westerly of Fergus Falls. Such disparity depends only on the fact that in the case of the higher rates the state boundary line is crossed and on no other condition whatsoever; and it constitutes undue and unjust

discrimination in fact, not only against the shipper at Fergus Falls, but, as well, against the consumer in the North Dakota towns in question.

## Commodity Rates.

The main lines and branches of the Northern Pacific and Great Northern Companies within the states of Minnesota and North Dakota lie wholly (excepting certain limited tracts in which grain cannot be grown, such as the Bad Lands of North Dakota) within grain fields, and grain is shipped in substantial quantities from nearly all stations in these fields to Duluth, Minneapolis, and Superior.

Shipments of coal originate at the head of the Lakes—that is to say, Duluth, Minn., or Superior, Wis.—and find their destination at all localities served by the companies or either of them in Minnesota and eastern North Dakota.

Shipments of lumber originate at Duluth, Cloquet, Little Falls, and other points in Minnesota, and are destined to points throughout Minnesota and North Dakota.

Shipments of live stock originate in Minnesota, North Dakota, and eastern Montana, and go to South St. Paul or Chicago.

Conditions attending transportation are substantially the same as to all these commodities moving eastwardly, whether the shipment originates in Montana, North Dakota, or Minnesota, or whether it finds its termination at one of the Minnesota terminals of the companies, or at Superior, Wis.

Conditions attending transportation are substantially the same as to all these commodities moving westwardly, whether the shipment originates at a Minnesota point or at Superior, Wis., or whether it finds its destination in Minnesota or North Dakota.

Because conditions attending transportation are substantially the same, any difference in the basis of rates charged for transportation of coal, whether the shipment originates at Duluth, Minn., or at Superior, Wis., and is destined to any locality in Minnesota or in eastern North Dakota, or in the basis of rates for transportation of grain, whether the shipment originates in Minnesota or North Dakota or is destined to Minneapolis or Duluth or Superior, or in the basis of rates for transportation of lumber, whether the shipment is destined to a point in Minnesota or to one in North Dakota, or in the basis of rates for the transportation of live stock, whether the shipment originates in Minnesota, North Dakota, or eastern Montana involves an undue and unjust prejudice and disadvantage, in fact, against the localities subject to the higher basis of rates, and an undue and unjust preference and advantage in fact to the localities given the lower basis. Establishing the rates prescribed by chapter 232, Gen. Laws 1907 (Rev. Laws Supp. 1909, §§ 2007–11 to 2007–17), and maintaining these rates for transportation wholly within Minnesota simultaneously with the maintenance of the interstate rates at present maintained for interstate traffic between Superior and localities in Minnesota, North Dakota, and eastern Montana and between localities in Minnesota and localities in North Dakota and eastern Montana, would involve on the part of the Northern Pacific and Great Northern Companies undue and un-

just discrimination in fact against shippers, receivers, and localities transacting the interstate business, and would seriously impair the interstate business of the carriers. If the companies shall be compelled to maintain within Minnesota the rates prescribed by chapter 232, they will be compelled to reduce the basis of their interstate rates between eastern Montana and North Dakota points and Minnesota points and between eastern Montana, North Dakota, and Minnesota points and Superior to a substantial parity with the basis prescribed by chapter 232, in order to avoid undue and unjust prejudice and disadvantage in fact against shippers and localities transacting the interstate business, as well as in order to protect the interstate business of carriers against serious impairment.

Such reduction must be substantial. For example, the present rate on soft coal from Duluth to Wahpeton is $2 per ton. The rate prescribed by chapter 232 from Duluth to Breckenridge is $1.31 per ton. That act provides that a minimum car load of soft coal shall be 30,000 pounds or 15 tons. So that the reduction that will be necessary to avoid discrimination against the interstate locality in the rate on soft coal will be $10.35 per minimum car load.

Duluth, Minnesota, Superior, Ashland, Green Bay, Manitowoc, Sheboygan, and Milwaukee, Wis., Gladstone, Mich., Chicago, Ill., the Peoria, Ill., district, the Springfield, Ill., district, the Streator, Ill., district, and the La Salle, Ill., district, are all competitive points for the distribution of coal into the state of Minnesota.

For many years rates on coal from the various distributing points to localities in southern Minnesota have borne such a relation as to admit of free competition of the various distributing points and of the carriers serving them.

If the rates on coal prescribed by chapter 232, Gen. Laws 1907, shall take effect, the result will be substantial reduction in rates on coal from Duluth to southern Minnesota localities. Such a reduction will deprive all these various distributing points in Wisconsin, Michigan, and Illinois of their power to compete with Duluth in its distribution of coal in Minnesota, unless the carriers serving them shall reduce their interstate rates into Minnesota to a parity with those prescribed by chapter 232 from Duluth. If such carriers shall reduce their interstate rates in Minnesota to a parity with the rates prescribed by chapter 232, the relation which now exists between rates on coal from these various distributing points and localities in northern Iowa and in South Dakota will be destroyed, unless rates shall be similarly reduced from these various distributing centers to localities in these two districts.

Interstate rates on cattle, hogs, sheep, and coarse grain would be affected by the rates prescribed by chapter 232 in the same manner as rates on wheat and coal.

Under the milling in transit privileges, so called, owners of wheat at any point in Minnesota, North Dakota, or South Dakota may pay rates equal to the sum of the rate between the point of shipment to Minneapolis and the proportional rate from Minneapolis to Chicago (for many years and at present the sum of 7.5 cents per cwt.), have it milled at Minneapolis, and within a limited period of time forwarded to Chicago as flour.

In order to allow mills located at other towns in Minnesota to compete with Minneapolis, a like milling in transit privilege has been accorded owners of wheat to ship via such other towns as via Minneapolis, and mills have been established in many such towns under a guaranty that rates into the towns in which such mills are located on wheat in and flour out to Chicago should not exceed the rates from the same points to Chicago via Minneapolis with the milling in transit privilege. Chapter 232, Gen. Laws 1907, substantially reduces rates on wheat within Minnesota. The result will be, if that law takes effect, that the milling in transit rate from points in Minnesota via Minneapolis to Chicago will be automatically reduced substantially. Unless, then, all interstate rates between Minnesota points and Chicago via some interior mill town and with a milling in transit privilege shall be reduced to a substantial parity with the reduced milling in transit rate to Chicago via Minneapolis, Minneapolis will have a substantial advantage in its interstate rates on wheat over the various mill towns in the interior of the state, and wheat in general will as a result of this advantage go to Minneapolis.

## Passenger Rates.

Prior to the taking effect of chapter 97, Gen. Laws 1907 (Rev. Laws Supp. 1909, §§ 2007—1 to 2007—2), the general basis of rates for the transportation of passengers between any two points on the Northern Pacific system had been for some years 3 cents per mile for passengers of 12 years of age and over, and 1½ cents per mile for passengers under 12 years of age.

Chapter 97, Gen. Laws 1907, prescribes as a maximum for transportation of passengers wholly within the state of Minnesota 2 cents per mile for passengers of 12 years of age or over and 1 cent per mile for passengers under 12 years of age.

After the maximum rates prescribed by chapter 97 were installed, the sum of the locals between Moorhead and other Minnesota points and Moorhead and points westerly thereof was less than the then existing interstate rates between Minnesota points and points westerly thereof.

The result of this disparity between the through interstate rate over Moorhead and the sum of the locals over Moorhead was this: In the first month after the taking effect of chapter 97, the revenue for passenger business on the Northern Pacific between Moorhead and other Minnesota points increased 647 per cent. over that for the corresponding month of the preceding year, while, eliminating Moorhead business, the revenue for passenger business within the state decreased 2 per cent. In June, 1907, the second month after the taking effect of chapter 97, there were sold by the Northern Pacific Company 4,037 tickets between St. Paul or Minneapolis, on the one hand, and Moorhead or East Grand Forks, on the other, as compared with only 172 such tickets in the corresponding month of the year before; and in June, 1907, there were sold only 173 tickets between St. Paul or Minneapolis, on the one hand, and Grand Forks and Fargo, on the other, as compared with 984 such tickets in the corresponding

month of the year before. In May and June, 1906, only one cash fare was collected on a train between Moorhead and St. Paul or Minneapolis. In those months in 1907 there were 1,168 full cash fares and 82 cash half fares so collected.

Thus the necessary, immediate, direct effect of the operation of chapter 97 was to deprive the Northern Pacific Company of a substantial amount of its interstate passenger business through Moorhead.

Notwithstanding the facility with which interstate passengers could avoid the discrimination against them by making two contracts with the company, one of which should cover the mileage in Minnesota, discrimination in fact against the interstate passenger through Moorhead on the Northern Pacific still existed, and was practiced. It existed against a passenger who, applying for a through ticket, did not know that the sum of the locals on Moorhead was less than the through rate, against the passenger with a trunk which he could not check through unless on a through ticket, and against a passenger who was compelled to use a sleeping car.

As soon as it reasonably could do so, the Northern Pacific remedied this discrimination by reducing all its interstate fares for passenger transportation through Moorhead to an amount no greater than the sum of the locals over Moorhead. Meantime and before tariffs establishing the new reduced interstate rates over Moorhead had been filed, the state of Wisconsin had enacted a two cents per mile passenger fare law, and the state of North Dakota a two and one-half cents per mile law. The rates, therefore, newly established by the Northern Pacific Company between St. Paul, for example, and points in North Dakota and beyond, were in general less than the theretofore existing rates by approximately one cent per mile for the mileage of the transportation in Minnesota and one-half cent per mile for the mileage in North Dakota. And the rates newly established by the Northern Pacific jointly with other companies for passenger transportation between points easterly of Minnesota and points on the line of the Northern Pacific were in general less than the theretofore existing rates by approximately one cent per mile for the mileage of the transportation in Wisconsin and Minnesota and one-half cent per mile for the mileage in North Dakota.

These reductions in rates were compelled by the necessary, immediate, and direct effect of the operation of the laws of the respective states above recited, not only in order that undue and unjust discrimination in rates might be avoided, but, as well, in order that the companies might transact interstate passenger business freely and without impairment of volume.

Prior to the taking effect of the respective orders complained of and of the two-cents maximum passenger fare law, the tariffs of the Great Northern and Northern Pacific Companies for the transportation of passengers or merchandise in Wisconsin, Minnesota, North Dakota, and South Dakota were fair as between the different states, and the local tariffs in each state were fair as compared with the interstate tariffs between such states or any two thereof; and the

tariffs now maintained by the companies and each of them for the transportation of commodities covered by chapter 232 are fair as between these states, and the local tariffs in each state are fair as compared with the interstate tariffs between such states or any two thereof.

The installation of the rates prescribed by the respective orders destroyed that fairness as to merchandise rates, the installation of the two-cents passenger rate destroyed it as to passenger rates, and the installation of the rates prescribed by chapter 232 would destroy it as to rates on commodities covered by it.

It is wholly impossible for carriers situated as are the Great Northern, Northern Pacific, and Minneapolis & St. Louis Companies to maintain materially lower rates or a materially lower basis of rates or a different classification of subjects of transportation, or a different relation between rates for different classes of merchandise, for traffic wholly within Minnesota, than for that between Minnesota and any of its neighboring states without unjust and undue discrimination in fact against the localities in the neighboring states, and without serious impairment of the volume of the interstate business of the carriers. Such lower basis of rates within Minnesota than between Minnesota and its neighboring states would result in the promotion of the growth and prosperity of localities in Minnesota at the expense of localities in neighboring states and the enhancement of the value of property in Minnesota, and the serious impairment of the value of the property of all business men, as well as of that of the carriers themselves in the neighboring states.

Duluth and Superior, Grand Forks and East Grand Forks, Fargo and Moorhead, and Wahpeton and Breckenridge are so situated that each pair must be considered for the purpose of rate making as one locality. Both as a practical matter of the operation of a railroad and in order that undue and unjust discrimination as between the members of any pair may be avoided, each city of each pair must have rates equal to those accorded to the other city. If different rates, a different classification, or a different basis of rates be lawfully prescribed by one regulating power in or out of one city of any pair to those prescribed by another regulating power in or out of the other city of the pair, the carriers serving them both must, in order to avoid undue and unjust discrimination in fact as between them as well as to preserve their own power to transact business with each of them, adopt for each city the lower rates or basis of rates, or classification prescribed for either city.

If it should be necessary for the companies involved, in order that discrimination may be avoided, or in order that the companies may preserve the volume of their respective businesses in interstate transportation free from impairment in volume, to install for their interstate business a basis of rates no higher than these respectively prescribed in the acts and orders complained of, and to extend the rates for their interstate long-haul business upon the principle provided in said acts and orders, the result will be a substantial diminution in the revenues of the companies from their interstate business. For

example, the diminution in the revenue of the Northern Pacific Company for the year ending June 30, 1906, the last fiscal year prior to the taking effect of the order of September 6, 1906, from its interstate business in transportation of commodities covered by chapter 232 alone, if the basis prescribed by chapter 232 had been applied to its rates for such interstate business, would have been $4,193,283.04; and the loss in such interstate revenue for such year for transportation of merchandise covered by the order of September 6, 1906, if the basis prescribed by the order had been applied to its rates for such interstate business, would have been $4,119,761.96. The loss in its interstate business from passenger transportation, if the two-cents maximum rate had been applied during such year, would have been $1,444,955.35, or a total loss, on account of the acts and orders complained of, of $9,758,000.35.

If, in order to prevent discrimination as between different states, it shall be necessary for the companies involved to apply for local business within the respective states, the same basis of rates as those prescribed for business local to Minnesota by the acts and orders respectively complained of, the loss in revenue to the companies involved will be substantial. For example, in the year 1906 the loss in revenue of the Northern Pacific Company, if the basis prescribed by chapter 232 had been applied to its local business in transportation of commodities covered thereby in other states, would have been $198,540.51; and its loss in revenue, if the basis of rates prescribed in the order of September 6, 1906, had been applied to its local business in other states for transportation of merchandise covered thereby, would have been $952,644.83, or a total loss on freight of $1,151,-185.34; and, if the two-cents maximum passenger rate had been applied to its local business in other states, the loss in revenue would have been $990,908.82, or a total loss, under the acts and orders complained of, of $2,142,094.16.

The facts which have been recited were found by the master, and the foregoing statement of them is, with rare exceptions, in his clear and concise language. Many exceptions are leveled at these findings, but they are sustained by clear and convincing evidence; and the only question remaining here is: Do they justify the conclusion that the effect of the acts and orders prescribing the Minnesota maximum fares and rates is to impose a substantial burden upon or to regulate or to discriminate against interstate commerce, or to create unjust discrimination between interstate localities? Counsel for the defendants insist that this question should be answered in the negative.

They argue that the prescription and enforcement of these fares and rates cannot constitute an unconstitutional burden upon or interference with interstate commerce because the orders and acts relate to commerce within the state only and the state has power to regulate its purely local commerce. This contention, however, cannot be sustained because, as has been demonstrated in the earlier part of this opinion, if, by their natural or necessary operation, these acts and orders have the effect substantially to burden interstate commerce, they fall under the ban of the Constitution and beyond the power of .

the state whatever their terms or the intent of their makers may have been.

They say that, while the reduction of the local fares and rates may induce the companies to reduce their interstate rates and fares across the borders of the state to a parity with the local rates, this is the voluntary act of the companies not directly required by the laws and orders. There are, however, known and inexorable laws of commerce, and one of them is that transported articles will move at the lowest available rates. Reduce local fares and rates so that fares and rates in interstate commerce across the borders of the state are substantially higher than the sums of the locals over the Minnesota stations on or near the state boundaries and the companies must reduce their interstate fares and rates on that portion of their interstate commerce affected by the sums of the locals over the Minnesota borders to a substantial parity with the sums of the locals or their interstate commerce affected thereby will unavoidably become intrastate commerce and move at the sums of the locals. There is nothing voluntary on the part of the companies in the loss or burden imposed upon them by these reductions. That they must suffer whether they reduce their interstate rates or maintain them and permit the transformation of their affected interstate commerce into intrastate commerce by rebilling and local contracts so that it can pass at the sums of the locals. The loss of the difference in revenue between that derived from their former interstate rates and that derived from the sums of the locals is a direct and unavoidable burden upon their interstate commerce imposed by the acts and orders stated which the companies may not by any device avoid.

Moreover, the acts and orders making these intrastate reductions necessarily operate to discriminate against interstate commerce and the right of the companies to carry it on, and in that way constitute a direct burden upon such commerce. Mr. Justice White said in the Pullman Company's Case, 216 U. S. at page 65, 30 Sup. Ct. at page 236 (54 L. Ed. 378), that, though a power exerted by a state may not abstractly impose a direct burden on interstate commerce, yet such exertion will be a direct burden upon such commerce if the power as exercised operates a discrimination against that commerce, or, what is equivalent thereto, discriminates against the right to carry it on. If the companies exercised their right to maintain and did maintain their former interstate rates upon that portion of their interstate commerce affected by the local Minnesota rates, they lost to local commerce that interstate commerce, because it passed by rebilling and local contracts at the sums of the locals. This necessary effect of the local maximum rates was a direct discrimination against interstate commerce and the right to conduct it, and hence a direct burden upon that commerce. If, on the other hand, to avoid this discrimination the companies reduced their rates, that reduction was a like direct burden, and no course was open to them whereby they could exercise their constitutional right to conduct their interstate commerce free from the direct regulation thereof effected by these acts and orders.

Another vicious and inevitable effect of these acts and orders is

the unjust discrimination in fares and rates between localities in Minnesota and those beyond its borders which they effect. Moorhead, Minn., and Fargo, N. D., are practically the same distance from St. Paul, Minneapolis, and Duluth, respectively. They have long received, and they ought to continue to receive, the same fares and rates in and out. This is also true of Duluth, Minn., and Superior, Wis.; Breckenridge, Minn., and Wahpeton, N. D.; East Grand Forks, Minn., and Grand Forks, N. D. These acts and orders reduced the fares to and from the Minnesota towns of these pairs from and to other Minnesota points 33⅓ per cent., and the freight rates from 7 per cent. to 25 per cent., while the former interstate fares and rates from and to the other towns of the pairs remained in effect, as to commodity rates under the protection of the injunction of this court, and would have continued in effect in the matter of merchandise rates and the passenger fares had not the prohibition of discriminations between localities by the interstate commerce law and the laws of trade which have been considered compelled the companies to reduce their interstate rates to a parity with the local rates prescribed. The discrimination thus wrought by these acts and orders between the towns mentioned on the state lines is but illustrative of the undue preference and advantage the local reductions gave to Minnesota cities and towns, and the unreasonable prejudice and disadvantage to which they subjected the towns and the cities of other states similarly situated in their vicinity.

Congress by the "act to regulate commerce" (24 Stat. 379) forbade the companies to make or give any undue or unreasonable preference or advantage to any party or locality, or to subject any party or locality to any unreasonable prejudice or disadvantage in any respect whatsoever, and the prevention of the discrimination thus prohibited was one of the main purposes of this legislation. The first section of the act, however, contained this provision:

"Provided, however, that the provisions of this act shall not apply to transportation of passengers or property, or to the receiving, storage or handling of property wholly within one state, and not shipped to or from a foreign country from or to any state or territory aforesaid."

The result was that the act of Congress forbade, and the acts and orders of the officers of Minnesota compelled, this discrimination between localities under the penalty of the surrender by the companies of a substantial part of their interstate commerce or of the revenue therefrom. Counsel for the defendants argue, however, that this radical discrimination is not forbidden by the interstate commerce law because it is a discrimination wrought, not by an undue difference between intrastate rates of which they say the state has exclusive jurisdiction, nor by an undue difference between interstate rates of which they admit the nation has exclusive jurisdiction, but by an undue difference between intrastate rates and interstate rates, and they contend that over the discrimination thus wrought neither state nor nation has any power. The argument, however, again disregards the broad and fundamental difference between the power of the state over intrastate commerce and the power of the nation over interstate com-

merce. The state may regulate its intrastate commerce so far only as the exercise of its power does not substantially burden or regulate or discriminate against interstate commerce, but no farther. A state may not prohibit or regulate discrimination between interstate and intrastate rates in such a way as substantially to burden or regulate interstate commerce, as, for instance, by the prohibition of a higher charge or rate for a short haul wholly within the state than for a long haul that includes the short haul and extends into another state, because such action burdens and regulates interstate commerce. Louisville & Nashville R. R. Co. v. Eubank, 184 U. S. 27, 42, 43, 22 Sup. Ct. 277, 46 L. Ed. 416. By the same mark, because it is a direct regulation of interstate commerce, the nation may regulate and prohibit discriminations wrought by an undue difference between interstate and intrastate rates, although such regulation or prohibition may also to some extent affect and regulate intrastate commerce. For to the extent necessary completely and effectually to regulate interstate commerce the nation by the Congress and its courts may affect and regulate intrastate commerce. United States v. Colorado & N. W. R. Co., 157 Fed. 321, 331, 85 C. C. A. 27, 37, 15 L. R. A. (N. S.) 167; Brown v. Maryland, 12 Wheat. 419, 448;[1] Gibbons v. Ogden, 9 Wheat. 1, 209, 210, 6 L. Ed. 23; Gulf, Colorado, etc., Ry. Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; Interstate Commerce Commission v. Detroit, etc., Ry. Co., 167 U. S. 633, 642, 17 Sup. Ct. 986, 42 L. Ed. 306; State Freight Tax Case, 15 Wall. 232, 275, 280, 21 L. Ed. 146; Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1, 8, 24 L. Ed. 708; Chy Lung v. Freeman, 92 U. S. 275, 280, 23 L. Ed. 550; Railway Co. v. Husen, 95 U. S. 465, 471, 472, 473, 24 L. Ed. 527; Hall v. De Cuir, 95 U. S. 485, 488–490, 497, 498–513, 24 L. Ed. 547; Cooper Mfg. Co. v. Ferguson, 113 U. S. 727, 736, 737, 5 Sup. Ct. 739, 28 L. Ed. 1137; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465, 479, 480, 481, 484, 485, 488, 489, 490, 491, 507, 508, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; Welton v. Missouri, 91 U. S. 275, 280, 23 L. Ed. 347; Lyng v. Michigan, 135 U. S. 161, 166, 10 Sup. Ct. 725, 34 L. Ed. 150; Norfolk, etc., Ry. Co. v. Pennsylvania, 136 U. S. 114, 115, 118, 120, 10 Sup. Ct. 958, 34 L. Ed. 394; Crutcher v. Kentucky, 141 U. S. 47, 57, 58, 59, 11 Sup. Ct. 851, 35 L. Ed. 649; Osborne v. Florida, 164 U. S. 650, 655, 17 Sup. Ct. 214, 41 L. Ed. 586; Caldwell v. North Carolina, 187 U. S. 622, 623, 23 Sup. Ct. 229, 47 L. Ed. 336. "This power," said Chief Justice Marshall, "like all others vested in Congress, is complete in itself, may be exercised *to its utmost extent*, and acknowledges no limitations, other than are prescribed in the Constitution. * * * If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, *is vested in Congress as absolutely as it would be in a single government*, having in its Constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States." Gibbons v. Ogden, 9 Wheat. 1, 189, 194, 197, 6 L. Ed. 23; Lottery Case, 188 U. S. 321, 346, 347, 359, 23 Sup. Ct. 321, 47 L. Ed. 492.

[1] 6 L. Ed. 678.

The power therefore to prohibit the railroad companies from making or permitting any undue discrimination between localities and parties by unreasonable differences between intrastate and interstate rates was vested in Congress, and no acts or orders of the state or its officers could justify such a discrimination. If, as the Supreme Court held in the Eubank Case, a state has no authority to suppress such a discrimination, much less has it the power to create and maintain it.

But counsel insist that, if Congress had the power to forbid this discrimination, it did not exercise it because it declared in the proviso to section 1 that the provisions of the interstate commerce act should not apply to transportation wholly within one state. But the main object of the act was to prevent every undue discrimination between parties and between localities. When it was enacted there was a crying evil in such discriminations, an insistent public demand for the remedy thereof, and determined effort by the legislators to make the prohibitions of such discriminations as broad, searching, and effective as the Congress had the power to make them. It had, as we have seen, ample authority to forbid discriminations wrought by differences between intrastate and interstate rates, but none to prohibit discriminations caused by differences in rates for transportations wholly within a state. The act prohibits any undue discrimination in any respect whatever between localities under similar circumstances and conditions by any common carrier subject to its provisions. In the light of these facts, the natural and reasonable construction of the proviso in section 1 is that it was inserted out of abundance of caution to make sure that the broad terms of the act did not go beyond the constitutional power of the Congress and directly regulate intrastate commerce more than was necessary completely to regulate interstate commerce, and that it has no farther effect upon the subject of discrimination now under discussion. The evil the act was passed to remedy, the main purposes of its passage, the public demand for a prevention of all discriminations, the patent effort of the legislators to meet this demand, and the broad terms of the prohibitions themselves compel the conclusion that the Congress intended to exercise, and that by this act it did exercise, its constitutional power to prevent discriminations of the character here in question to its utmost extent, and that the companies were and are prohibited thereby from making or maintaining the unjust discriminations between localities which the maintenance of their former lawful interstate fares and rates and the intrastate rates prescribed by the acts and orders of the officers of the state would necessarily effect. Reliance Textile & Dye Works v. Southern Ry. Co., 13 Interst. Com. R. 48, 54.

The next suggestion is that, if the prohibition of the interstate commerce act applies to discriminations between intrastate and interstate rates, it applies only when the transportation is under substantially similar circumstances and conditions and the acts and orders in question render the circumstances and conditions under which the intrastate rates are charged dissimilar from those which condition the interstate rates. But state laws and orders effecting discriminations forbidden by acts of Congress cannot be held by themselves to

create such dissimilar conditions as to warrant the maintenance of such discriminations.

Finally, counsel cite, to overcome the proof of the substantial burden and the direct regulation of interstate commerce effected by the acts and orders in this case, with which this record teems, these words from the opinion of Mr. Justice Brewer in Ames v. Union Pacific Ry. Co. (C. C.) 64 Fed. 172:

"Neither can I understand how the reduction of local rates, as a matter of law, interferes with interstate rates. It is true that the companies may, for their own convenience, to secure business, or for any other reason, rearrange their interstate rates, and make them conform to the local rates prescribed by the statute; but surely there is no legal compulsion. The statute of the state does not work a change in interstate rates, any more than an act of Congress prescribing interstate rates would legally work a change in local rates. Railroads cannot plead their own convenience, or the effect of competition between themselves and other companies, in restraint of the otherwise undeniable power of the state."

The reduction of local rates does not interfere with interstate rates "as a matter of law," yet it may do so as a matter of fact. Whether or not the general and sweeping reductions in local rates in Minnesota necessarily interfere with interstate rates and interstate commerce is in this case, as it must be in every case, a question of fact. The facts which determine that question in this case have been set forth in this opinion at great length, because it is upon them, and not upon legal inferences, that the answer to the question, whether or not the effect of the necessary operation of the acts and orders challenged is substantially to burden interstate commerce, now rests. Those facts are that it was not for "their own convenience," but at great inconvenience and loss, not on account of the "effect of competition between themselves and other companies," but because these acts and orders, the prohibition of discrimination between localities by the interstate commerce act and the laws of trade, forced them to do so, that the defendants reduced their interstate commerce rates to a parity with the local rates and submitted to the loss of interstate revenue this action entailed. The opinion of Mr. Justice Brewer in the Ames Case is inapplicable to the cases in hand because no such array of condemnatory facts was ever submitted to him in that case, and it is perhaps not too much to say that no case has been found in the books in which any such proof of the unavoidable effect of general reductions of intrastate rates to substantially burden and directly regulate interstate commerce has ever been presented.

Minnesota, North Dakota, South Dakota, and Wisconsin embrace a vast region 1,000 miles in extent, traversed by the railroads of the defendant companies, which produces the same things shipped to the same markets and consumes the same things bought in the same markets. The conditions of the transportation of passengers and freight in interstate traffic and also in intrastate traffic have been and are identical, and a relative, fair, and equable relation between fares and rates in interstate commerce and fares and rates in intrastate commerce had been maintained before the acts and orders here challenged were made. The railroad companies had established and were collect-

ing their interstate fares and rates pursuant to the act to regulate commerce enacted by the Congress of the United States. Those fares and rates were lawful, hence presumptively reasonable, and neither the officers of the state of Minnesota nor any court, state or federal, could legally adjudge them unreasonable until they had been denounced by the Interstate Commerce Commission. Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553. The fares and rates and the traffic in intrastate commerce were so inextricably interwoven with the fares and rates and the traffic in interstate commerce that a general and substantial reduction of the fares and rates in either by its necessary operation compelled a similar reduction in the other, because the interstate commerce act forbids the discrimination that would otherwise result and because traffic will move only at the lowest available rates. The subject of the fares and rates in interstate commerce through this region is national in its character and capable of regulation by uniform rates, and the railroad companies are therefore free to make and regulate them subject only to the orders of the Interstate Commerce Commission. The officers of the state of Minnesota by the acts and orders challenged made a general and sweeping reduction of 33⅓ per cent. in passenger rates within that state, of 20 per cent. to 25 per cent. in rates on general merchandise, of 7.37 per cent. on grain, coal, live stock, and lumber, and of 13.58 per cent. on in-rates to distributing points.

The effect of the necessary operation of these acts and orders was substantially to burden and directly to regulate the interstate commerce of the companies by causing the transformation of that part of their transportation upon which their former interstate rates were higher than the sums of the locals over the border towns in Minnesota into local commerce at those sums, or by causing the companies to reduce their interstate fares and rates affected by the reduced local fares and rates to a parity therewith. This effect was unavoidable because the interstate commerce law prohibited the companies from giving to Minnesota towns and cities the undue and unreasonable advantage and from subjecting the cities and towns of other states in the vicinity to the undue and unreasonable disadvantages which a maintenance of their former interstate fares and rates and the prescribed local fares and rates would have wrought, and because passengers and freight will move at the lowest available rates.

This effect was not like that of the directions concerning the movements of particular trains, the inspection of animals to guard against disease, the reduction of intrastate rates on one or a few articles of commerce, and similar regulations which were sustained in the cases in the earlier part of this opinion and in others of like character, because their effect upon interstate commerce was so incidental and remote as to be negligible. The effect of these acts and orders was substantial, direct, controlling, and compelling. They are general and sweeping in their terms, they reduce the fares and rates on the great body of intrastate commerce in the state of Minnesota from 7 to 33⅓ per cent., and their inevitable effect is directly and unavoidably

to regulate much of the interstate commerce of the defendant companies and unavoidably to cause each of them great loss of revenue therefrom.

No case has been found in the books in which the facts disclose a more substantial burden imposed upon interstate commerce by the acts or orders of the officers of any state than that which the effect of the necessary operation of these acts and orders entails upon the interstate commerce of these companies. If in the early proceedings in the Northern Pacific Case the Supreme Court was moved to say, of the issue whether the necessary effect of these acts and orders was to interfere with and to regulate interstate commerce, "the question is not, at any rate, frivolous," how, now, that their necessary effect upon that commerce has been indisputably proved to be not only general and substantial, but controlling and compelling, may they escape the ban of the Constitution? If one state might by such radical reductions of its local fares and rates below legal interstate fares and rates constitutionally use the laws of trade and the prohibition of discriminations in the interstate commerce law to force like reductions of interstate rates, all states might do so, and the power of the states to regulate fares and rates in interstate commerce would be supreme and that of Congress and the Interstate Commerce Commission inferior and futile. Such does not seem to be the law.

Each of the acts and orders challenged has the natural and necessary effect substantially to burden and directly to regulate interstate commerce, to create undue and unjust discriminations between localities in Minnesota and those in adjoining states, and it is unconstitutional and void.

The master also found that the maximum state rates prescribed by these acts and orders produced incomes insufficient to pay the cost of earning them, taxes and just returns upon the real values of the Minnesota properties of the defendants respectively used to carry on their intrastate commerce in that state. The actual earnings, taxes, and cost of conducting transportation during the year ending June 30, 1908, the year when the fares and all the rates, except the commodity rates, were in actual operation, were proved, and the master found that the net freight income for that year of the Northern Pacific Company from its Minnesota intrastate freight business yielded an annual return of only 1.941 per cent. on the value of its property used to produce that income, and that if the commodity rates had been in operation this percentage would have been still smaller, that its net income from its intrastate passenger business was sufficient to yield an annual return of only 4.2 per cent., and its net income from all its intrastate business in Minnesota an annual return of only 2.909 per cent. of the values of its property assignable thereto respectively. He reported that the net income of the Great Northern Railway Company from its Minnesota intrastate freight business was sufficient to yield an annual return of only 5.468 per cent. of the value of its property assignable to that business, and if the commodity rates had been in force the return would have been less than 5 per cent., that its net income from its Minnesota passenger business yielded a return of

only .925 per cent. on the value of its property assignable to that business, and that the net income from all its Minnesota intrastate business was sufficient to yield an income of only 3.359 per cent. on the value of its property assignable thereto. His report is that, if the acts and orders of which complaint is made had been in force during the fiscal year 1907, the year to which the proof is especially addressed in the case of the Minneapolis & St. Louis Company, the net income derived from that company's Minnesota intrastate business would have been sufficient to pay an annual return of only 2.93 per cent. on the value of its property assignable to that business, that the net income derived from its Minnesota passenger business would have yielded an annual income of only 1.79 per cent. on the value of its property assignable to that business, and that its Minnesota net income from intrastate freight and passenger business would have been sufficient to earn an annual return of only 2.47 per cent. on the value of its property assignable to all its Minnesota intrastate business.

All the Minnesota property of each of these companies devoted to transportation had always been and is used at the same time to conduct both intrastate commerce and interstate commerce. In determining whether or not the fares and rates challenged are confiscatory, the Minnesota intrastate commerce of these companies must be considered by itself. That commerce may receive the benefit of none of the revenue and must bear the burden of none of the cost of interstate commerce. The portion of the value of all Minnesota property of each of these companies which is chargeable with the economic duty to produce a just return by means of the intrastate commerce of that company must therefore first be ascertained, for that is the basic measure of the reasonableness of the return produced by the Minnesota fares and rates and the criterion for the trial of the issue confiscation vel non. In the ascertainment of the necessary facts and in the determination of this issue the master pursued this approved method in the case of each company. Take the Northern Pacific Company for example. He first found the real value of that portion of its Minnesota property devoted to transportation in Minnesota during the year ending June 30, 1908, to be $90,204,545, he apportioned this value between its freight business and its passenger business in that state that was conducted by the use of the property thus valued on the gross earnings basis, and in that way found $66,445,570 thereof assignable to its freight business and $23,758,975 assignable to its passenger business. On the same basis he divided the values thus respectively assigned to freight business and passenger business between the interstate business and the intrastate business of the company conducted by the use of the property so valued, and in that way apportioned $10,867,837 thereof to the company's intrastate freight business, and $8,159,782 thereof to its intrastate passenger business. From the evidence produced he found that the total freight revenue earned by the use, during the year ending June 30, 1908, of the company's Minnesota property valued, was $9,823,508.35, and that the total passenger revenue was $3,512,538.52. These earnings he divided between intrastate commerce and interstate commerce and found

that the intrastate freight earnings were $1,606,771.26, and the intrastate passenger earnings were $1,206,333.09. He found from the evidence that the cost of the freight business conducted by the use of the property valued was $5,343,718.25, and the cost of the passenger business was $2,311,631.95. He divided the freight and passenger cost respectively between the interstate commerce and the intrastate commerce and found that the cost of the intrastate freight business was $1,355,273.82, and the cost of the intrastate passenger business was $863,325. He deducted the annual intrastate freight cost from the annual intrastate freight earnings, and thus found the annual net intrastate freight income which, divided by the value assigned to the intrastate freight business, produced the 1.941 per cent. which he found to be the annual return which the rates challenged yielded upon the value of the Minnesota property of the Northern Pacific Company used to conduct it. In the same way the annual return upon the value assigned to the intrastate passenger business of this company was found, and the same method was pursued in ascertaining the returns yielded to each of the companies by the assailed fares and rates. His findings upon all these matters are terse, clear, and complete. They set forth the values found, the values assigned, the gross earnings, the net earnings. the cost found, the cost assigned, and where they are not drawn directly from the testimony of witnesses they carefully detail the methods and the computations by which they were reached. These findings are drawn from evidence which the master has reported to the court and which fills 19 printed volumes. Exceptions to them and to the report have been taken, and counsel for the defendants by brief and argument seem to have presented every contention and suggestion in opposition to them that learning, ingenuity, and ability enable man to conceive.

Fortunately it is unnecessary to enter upon any review of the authorities, or any discussion of the rules of law, by which the validity, under the fourteenth amendment to the Constitution of the United States, of the acts and orders which prescribed the fares and rates in question must be tried. They are presumed to be reasonable and valid because the Legislature and the Commission have the power to prescribe fares and rates of this nature on condition that they do not have the effect to deprive the owners of any property whose use is subjected to them, and the legal presumption is that the officers of the state have faithfully discharged their duties and acted within the constitutional limits of their power. Proof that they have not done so or that their acts and orders are violative of the federal Constitution must be clear.

It is, however, beyond the power of a state or of its officers to establish or maintain fares and rates the effect of the enforcement of which is equivalent to the taking of the property of public service corporations for public use without compensation, unless justice to the public requires such a confiscation. Fares and rates must be just, both to the people and to the carrier. In the case in hand justice to the people does not demand that the property of the defendant companies shall be taken for their benefit without just compensation, and fares

and rates which do not yield a reasonable return upon the real value of the property of the railroad companies subjected to them are confiscatory in their nature, and the acts and orders which establish or maintain them are unconstitutional and void. "What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public." Smyth v. Ames, 169 U. S. 466, 547, 18 Sup. Ct. 418, 42 L. Ed. 819; San Diego Land Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 442, 23 Sup. Ct. 571, 47 L. Ed. 892; Willcox v. Consolidated Gas Co., 212 U. S. 19, 41, 29 Sup. Ct. 192, 53 L. Ed. 382; Missouri, Kansas & Texas Ry. Co. v. Love (C. C.) 177 Fed. 493, 495.

Numerous exceptions are leveled at the master's findings of the values of the Minnesota properties of the companies used to conduct their intrastate transportation on the ground that they are too high. Speaking generally the same classes of evidence were introduced by the respective parties in the case of each of the companies and what will be said of the proof and the finding in the case of the Northern Pacific Company is applicable to the proof and the finding in the cases of the two other companies. Evidence of the cost of reproduction of the Minnesota property of each of the companies, of the original cost of acquisition and construction thereof, and of the average market value of the stocks and bonds of each of the companies for a reasonable period of time prior to June 30, 1908, was introduced before and considered by the master. He found the value of the Minnesota property of the Northern Pacific Company devoted to public use to be $90,204,545. He found the average market value of the stocks and bonds of the company for a period of five years was $509,824,723. The track mileage of the company in Minnesota was 21 per cent. of the track mileage of the Northern Pacific system, and hence the value of the Minnesota property of the company upon this basis was $107,630,191, nearly $17,000,000 more than the value found by the master. In the absence of competent evidence segregating the property of a railroad company devoted to transportation from its other property, all its property represented by the market value of its stocks and bonds is presumed to be devoted to public use. Atchison, Topeka & Santa Fé Ry. Co. v. Sullivan, 173 Fed. 456, 466, 97 C. C. A. 1, and the cases there cited. There was evidence in this case, however, that a considerable portion of the property of the Northern Pacific Company represented by the value of its stocks and bonds was not devoted to transportation; but there was no reliable evidence of the value of this property or of its relative value to the value of all the property of the company. For this reason the master rightly and unavoidably concluded that the market value of the stocks and bonds was not a sound premise from which to deduce the value of the Minnesota property of the company devoted to public use. Counsel for the defendants assail this conclusion and found an argument for a lower valuation upon this market value of the stocks and bonds and a statement in a monthly balance sheet of the company which

they introduced in evidence and which contained a statement of certain accounts of the company and of the book value of certain securities that appear from that statement not to be devoted to public use and to be held by the company. But this balance sheet was not an admission of the company against interest, the record contains no competent evidence of the value of these securities or of the accounts, and therefore the contention of counsel here is without foundation. For similar reasons the market values of the stocks and bonds of the other two companies present no credible evidence that the values found by the master were excessive.

The master found the original cost of the acquisition and construction of the entire railroad systems of each of the companies and the proportion thereof assignable on a track mileage basis to Minnesota. The amounts thus found prove to be much less than the values ultimately found by the master, and for this very good reason: These railroads were pioneers; they were built in large part over the prairies of Minnesota before they were settled and before many of the existing towns, villages, and cities along their lines came into existence. A large part of the right of way of the Northern Pacific Company was granted to it by the nation. The cost of rights of way from 5 to 40 years ago through wild lands, and through towns and villages whose population and the value of the property in which have since been multiplied by from 2 to 10, is obviously no criterion of the value of those rights of way in 1908, when they were used under these fares and rates and when agricultural lands in Minnesota were worth from $35 to $100 an acre, and rights of way and lands for yards and sites for stations in cities like St. Paul and Duluth have wonderfully increased in value. It is a fair return upon the reasonable value of their Minnesota property in 1908 to which these companies were entitled, and the cost of that property at times varying from 5 to 40 years ago may be some evidence; but it is certainly no criterion of its value in that year. In view of these facts the master rightly decided that the cost of reproducing this property new was a more rational and reliable measure of its real value than the original cost of its acquisition and construction or the market values of the stocks and bonds of the companies, and upon that basis he made his findings.

The Railroad Commission seems to have reached the same conclusion at an earlier date, for in the first part of the year 1906, before these suits were commenced, they had employed Mr. Dwight C. Morgan as their engineer, and had instructed him and had requested the railroad companies to find the respective values of their railway properties in Minnesota on the basis of the cost of their reproduction new. This basis is described in the instructions of the Commission to the companies under date of March 12, 1906, in these words:

"In estimating the value of the physical, real and personal property of the railway companies in the state of Minnesota, an estimate of the cost of reproducing them new is deemed essential as the prime factor. In respect to real estate and construction, this prime estimate is to be made as though the existing railways were not constructed and the regions through which they now extend were occupied as now, by the settlements, improvements, and varied industries. * * * The present value of the physical properties of

the railways will be obtained by deducting from the cost of reproduction of deteriorations by time and use, on the date corresponding to that of the estimated cost of reproduction."

A schedule of about 40 items originally suggested by the Commission, and perhaps subsequently somewhat modified, was used by both parties in these cases, and their evidence was directed to the values of these items on the basis of the cost of their reproduction new.

The first and largest item on the schedule was "lands for right of way, yards and terminals." In the case of the Northern Pacific Company the evidence on behalf of the complainant tended to show that the cost of reproducing this item was about $25,000,000. The claim of counsel for the Commission now is that the value of this item does not exceed $9,498,099.27, and the master found that the cost of its reproduction and its value were $21,240,562. In the testimony the item is divided into lands for rights of way, yards, and terminals in St. Paul, Minneapolis, and Duluth, which for brevity will be called "terminals," and other lands for rights of way, yards, and sites for stations through the other cities, towns, and villages and through the country, which will be termed "lands outside of terminals." The evidence for the defendants regarding this item consists of an estimate made and verified by Mr. Morgan and corroborating purchases and sales. Mr. Morgan had never bought and sold any real estate, except his homestead, nor was he acquainted with the value of real estate in general. To ascertain the value of the terminals in each of the three cities he took from the county records the considerations recited in the records of deeds of a large number of lots and lands in each of the cities, compared them with the assessed values of those lots and lands, and found the per cent. that on the average the assessed values were of the considerations recited in these records. In St. Paul this was about 60 per cent. He then laid out strips of lands of varying widths along each side of the railway lands he desired to value, divided these strips into such sections as he thought were of about uniform value, found the values of the land in these sections from their assessed values on the theory that the assessed values were, in St. Paul, 60 per cent. of their real values. From these values of the sections of his strips he deduced the values of the railway lands between the strips by a comparison of areas. To the values of the railway lands thus ascertained he added 75 per cent. because in his opinion it costs railroad companies 75 per cent. more than the normal market value of lots and lands in these three cities to obtain such irregular tracts as they need and now own. To ascertain the value of the lands outside of terminals, he searched out himself and by means of employés the prices at which many lots and lands throughout the region traversed by the railroads had been sold, and from these prices he estimated the value of the lands of the railway companies, and then multiplied these values by three, because, as he testified, it costs railway companies three times the normal value of lands to procure the irregular tracts necessary for their rights of way and station grounds through agricultural lands and the smaller towns, cities, and villages. By these means Mr. Morgan found and testi-

fied that the cost of reproduction, and hence the present value of the land for right of way, yards, and terminals, of the Northern Pacific Company, was $15,385,078.47. At the request of counsel for the defendants he made another estimate in which he omitted to use the multiples 75 per cent. of the normal terminal values and three times the normal values of lands outside the terminals, and disclosed therein the fact that if these multiples were not used his estimate would become $9,498,099.27, the value for which counsel for the defendants argue. But neither Mr. Morgan nor any other witness came to say that the latter was the true cost of reproduction or the real value of this item of the schedule. The defendants also introduced evidence of purchases and sales that tend to sustain Mr. Morgan's estimate of the value of this item.

On the other hand, the evidence for the complainants was, as to the terminals in the three cities, the testimony of three residents of each of those cities engaged in the real estate business, of long experience and accurate knowledge of the values of real estate in their respective cities, as to the values of the terminals of each of these companies, the testimony in the Northern Pacific Case of Mr. Cooper, the land commissioner of that company, who was in charge of its rights of way and had purchased for it since 1903 property for which there had been paid $6,139,542.35, and who had a general knowledge of the property in question and its value, the testimony in the cases of the other companies of officers thereof similarly qualified, and evidence of purchases and sales which tend to sustain the evidence of these witnesses. As to the lands outside of the terminals, the Northern Pacific Company produced the testimony of Mr. Cooper and proof of purchases and sales for railway purposes which tend to prove that his testimony of the cost of reproduction and the value of the property was not substantially above prices that had actually been paid for like property. He testified that he had much knowledge from his experience and observation of the cost and value of these lands outside the terminals, that he verified his knowledge by investigating the purchases and sales of property in the vicinities of these various rights of way, that the necessary cost of obtaining such rights of way by a railroad company was three times as much as the normal value of the land, and that his testimony of the value of these tracts was based upon that fact. The evidence in the other two cases was of the same character. In each of the three cases the master added to the values of the terminals in St. Paul and Minneapolis, established by the testimony of the real estate dealers and Mr. Cooper, 5 per cent. for the cost of acquisition and consequential damages and to the values of the lands for terminals in Duluth, verified by the witnesses for the companies, 25 per cent. for railroad value and the cost of acquisition and consequential damages, and from the values of lands outside terminals, established by the evidence for the companies, he deducted 25 per cent. The result was that his ultimate finding of the value of the first item on the schedule was about $4,000,000 below the value which the testimony of all the witnesses, except Mr. Morgan, sustained, about $6,000,000 above that which Mr. Morgan's tes-

timony supports, and about $11,000,000 above the amount which counsel for the defendant now urge the court to adopt. This finding of the master is assailed because he allowed 5 per cent. of the value of the terminals for cost of acquisition and consequential damages, because he increased the values of the terminals at Duluth, established by the testimony of the real estate dealers, 20 per cent. for the reason that they failed to give due weight to the value of these terminals for railway purposes, because the companies' estimates of the value of this item included an addition to the values of the St. Paul and Minneapolis terminals fixed by the real estate dealers of 25 per cent. thereof for railroad value, and because he failed to follow the theory of Mr. Morgan and to adopt the value which Mr. Morgan would have found if he had discarded his multiples.

But the evidence in this case is conclusive, nay, we may say it is without conflict, that every railroad company is compelled to pay more than the normal market value of property in sales between private parties for the irregular tracts it needs and acquires for rights of way, yards, and station grounds. The defendants' witness, Mr. Morgan, testified that in his opinion the companies necessarily paid three times the normal value for the lands outside of the terminals in the three cities and 75 per cent. more than the normal value for their terminals within those cities. The master in effect found that the cost of reproduction and the present value of the lands for the terminals in the three great cities, including therein all cost of acquisition, consequential damages, and value for railroad use which he allowed, was only about 30 per cent. more than the normal value of the lands in sales between private parties. He found the value of the lands outside the terminals to be only twice their normal value. Findings of lower values would have been contrary to the great weight of the evidence and without substantial support therein.

The measure of the value of real estate is its market value for its most available use. There was uncontradicted evidence that the most available use of the terminal lands in Duluth, the use for which they were of the greatest value, was their use for railroad purposes, that they were indispensable for those purposes, that the real estate dealers who testified to their values had fixed them originally in 1906, without regard to their value for railroad uses, and that since that time they had advanced in value from 15 to 25 per cent. Thus the proof is ample to sustain the addition to this 1906 estimate of the value of these lands of 25 per cent. thereof for railroad value, cost of acquisition, and consequential damages which the master allowed.

But counsel argue that this court should disregard Mr. Morgan's multiples and fix the value of this entire item at the amount that his estimate would produce if his multiples were not used, $9,498,099.27, because the original presumption was that the fares and rates fixed by the Legislature and the commission were just and reasonable, clear proof was requisite to overcome that presumption, if there is any substantial evidence to the contrary the proof is not clear, and the master's findings must be presumed to be wrong, and Mr. Morgan's evidence is sufficient to enable one fairly, in the exercise of an honest

judgment, to disregard the findings of the master and the evidence which supports it, and to adopt the lowest value claimed. This contention is urged with such force and frequent repetition in brief and argument, and is applied so persistently to the various specific findings of the master, that it deserves consideration.

Rate making, the determination of what shall be the railroad rates in the future, is a legislative function. But rate judging, the determination whether rates already made yield a fair return upon the reasonable value of the property used to earn them, or take that property without just compensation in violation of the Constitution, is a judicial function. Prentis v. Atlantic Coast Line, 211 U. S. 210, 226, 228, 29 Sup. Ct. 67, 53 L. Ed. 150; Missouri, Kansas & Texas R. R. Co. v. Interstate Commerce Commission (C. C.) 164 Fed. 645, 648. Why should the presumption that the judicial officer, on whom the duty to perform the latter function is imposed by the law, rightly discharges that duty and reaches just conclusions, be less persuasive than the presumption that legislative officers faithfully discharge theirs? When a rate is made under legislative authority, the legal presumption is that it is fair and reasonable, and proof to the contrary must be clear, especially in cases in which the rates challenged have never been in operation and injunctions are sought while their effect is yet speculative.

But the question whether fares and rates which have been put in operation confiscate the property of the companies in violation of the Constitution of the United States is a judicial, and not a legislative, question. And when that issue is presented the rules of law, of equity, and of practice applicable to the determination of judicial questions have effect. When, therefore, rates have been tried by actual use for many months, and their effect has become known and is proved, when the issue whether or not they take the property of the railroad company without just compensation has been made in a competent court, and all parties have introduced, in the presence, and subject to the cross-examination and rebuttal, of each other, all the evidence they desire, when that issue and the numerous subordinate issues it involves have been heard and decided, as they have been in the case in hand, by a master, who has personally heard the testimony of every witness, received and examined all the evidence, and made specific findings of every material issue of fact in the case, the judicial presumption arises that his findings are right. This is a presumption of reason as well as of law, a presumption that forces itself upon and compels the reflective mind. Take the general issue. The Legislature and the Commission decided it upon the information they had acquired as to the probable effect of the rates they were making before those rates were tried. The master decided it after the fares and all the rates, except the commodity rates, had been tried for many months and their actual effect was known and proved. The former decision was based on the conjectural effect of the rates; the latter, on their actual effect. The master decided this issue upon a full trial, in which all parties produced all their evidence, subject to the cross-examination and rebuttal of each of the other parties, in the manner which the wisdom and experience of centuries has taught is most conducive to the dis-

covery of the truth and the administration of justice. The Legislature and the Commission decided it without such trial or such proof.

Doubtless, if the fares and rates had been tested by the actual operation of the railroads under them, and the plenary proof of their effect and of the other facts presented to the master had been introduced before the Legislature and the Commission, they would have reached the same conclusions which the evidence forced upon the master's mind. They decided the issue upon evidence more conjectural or speculative; he, upon proof more certain and conclusive. And the presumption that a master learned in the law, accustomed by long experience at the bar and on the bench to hear and analyze evidence and draw just conclusions therefrom, has faithfully discharged his judicial duty and reached right results, is not less strong than the presumption that the Legislature and the Commission rightly discharged their official duties. The result is that when, after fares and rates have been in effect for months, plenary proof of that effect and of other facts pertinent to the issue of confiscation vel non is made before a master who finds the facts, the legal or judicial presumption that his findings are just and right, while not conclusive, is superior to the original presumption that they were just and reasonable, which arose before they were or could be tried, and it prevails over it. The question, therefore, upon the exceptions to the master's report, is not, is there any evidence upon which one might fairly, in the exercise of an honest judgment, reverse his findings? But it is, are the findings which are presumptively right sustained by clear proof? If they are, they should be affirmed, and the exceptions to them should be overruled.

Returning now to the finding of the value of the first item of the schedule, it is sustained by the testimony of nine real estate dealers familiar with the values of the properties in their respective cities, by the testimony of the officers of the companies who were well acquainted with the properties and their values, who had purchased rights of way that cost many millions of dollars, and by the corroborative evidence of purchases and sales at prices approximating the values found. It is met by the theoretic value of Mr. Morgan, based on his assessment sales method of proof, and by evidence of purchases and sales corroborating it. But the foundation of this value is what copying clerks wrote that grantors in deeds wrote were the considerations of their conveyances of certain properties, and all of these parties were strangers to the parties to this suit. It is conditioned by Mr. Morgan's opinion of the number of such considerations it was necessary to use to discover the true relation of considerations of deeds or presumptive values of properties described therein to their assessment values, by his opinion as to the width of the strips on each side of the rights of way and as to the number and the lengths of the sections of the strips requisite to ascertain just measures of the values of the rights of way between them. He concedes, and counsel for the defendants do not deny, that his method would not reliably indicate the value of any specific lot or tract of land of moderate dimensions, and it is difficult to understand how it can escape the maxim, "falsus in uno, falsus in omnibus." A careful consideration and analysis of Mr. Morgan's testimony and of the other evidence introduced to sup-

port it has convinced that they are too indirect, uncertain, and inconsequential to overcome the direct and convincing proof of the values of these properties which the complainants have made, and the exceptions to the master's findings of these values must be overruled.

Exceptions were taken to the allowance of interest at 4 per cent. per annum on the cost of the reproduction of the railroad properties during one-half of the estimated times of their construction. But the evidence is conclusive that moneys invested for the purchase of rights of way for, and in the construction of, railroads, ordinarily produce no net income during the period of construction, that the amount of capital thus losing returns is ordinarily equal to one-half of the cost of reproduction during the entire period of construction, or to the entire cost during one-half of that period. There is no doubt that interest at a fair rate on the capital invested in materials and labor that remain idle during construction is as much a part of the cost of constructing or reproducing a railroad as is the money paid for those materials or that labor. Brunswick Water District v. Maine Water Company, 99 Me. 371, 59 Atl. 537, 542. Mr. Morgan, the engineer and witness for the defendants, allowed in his report to the Commission, and verifies the justice of an allowance, of 4 per cent. per annum during one-half of the period of construction; but the amounts he allowed were less than those found by the master, because his estimates of the cost of reproduction and of the times requisite for construction were less. The weight of the testimony on this subject, however, sustains larger amounts than those fixed by Mr. Morgan or the master, and there was no error against the defendants in the latter's finding and allowance of the item here under consideration in either of the cases in hand.

The Minnesota Transfer Railway Company is a corporation and the joint agent of the owners of ten different lines of railway for the interchange of their freight traffic in St. Paul and Minneapolis. Each of the ten owners owns one-tenth of the property of the Transfer Company by virtue of an ownership of stock. The St. Paul Union Depot Company is a like corporation and joint agent of the owners of nine lines of railroad for the exchange of their passenger traffic, and it is owned by nine constituents in the same way. Each of the three defendant companies owns one share in each of these terminal companies, and the latter corporations and their properties are operated and used as tools of the railroad companies that own them, to conduct transportation for their exclusive use and benefit. The defendants complain because the master allowed to each of these three companies $1,186,191 as the cost of reproduction and the value of their respective interests in the property of these subsidiary companies, and because he allowed to the Northern Pacific Company $1,180,-151 for the cost of reproducing and the value of its interest in a similar corporation and its property used by the Northern Pacific Company for a like purpose at Duluth. It is not claimed that these interests are not worth, or that their cost of reproduction would not be, the amounts allowed; but it is contended that these values are not allowable at all, because they are represented by the stocks and bonds of the subsidiary companies. But these interests in these terminal

corporations and their property are the most indispensable parts of the Minnesota properties of the defendant companies used to earn the fares and rates here in question, and any estimate of the value or of the cost of reproduction thereof which omitted the value or the cost of reproduction of these interests would have been incomplete and deceptive. The master rightly considered and allowed their value.

There are exceptions because the master allowed to the Northern Pacific Company $1,613,612.76, to the Great Northern Company $3,219,642, and to the Minneapolis & St. Louis Railroad Company $608,896.43, for the solidification and adaptation of their respective railroads, and deducted nothing from the cost of reproduction for depreciation. But these amounts are those allowed by the defendants' engineer and witness Morgan in his original estimates of the cost of reproduction which he reported to the Commission, and there is much other evidence in the record to sustain them. It is clear that a new railroad may appreciate or depreciate as it grows older. It may be renewed, repaired, and improved day by day and year by year as it is operated, until its embankments become more solid, its culverts and bridges firmer and more reliable, its ties and rails more steadfast and secure, and its rolling stock more seasoned and better adapted to its service and to the railroad it traverses, and until the whole property becomes more valuable than it was when it was first constructed. On the other hand, its embankments and its roadbed may be neglected and permitted to deteriorate by the action of rain, snow, and frost, its ties may be allowed to become partially decayed, its bolts and rails loose, and its rolling stock worn, without adequate repairs, until the entire property suffers great depreciation. Whether at a given time a railroad property is more or less valuable than it would be if it had just been constructed is a question of fact, that in a suit of this nature must be answered by the evidence. That evidence in this case is that the railroads, rolling stock, and appurtenances which constitute the great transportation machines of these companies in Minnesota are in better condition for use, more efficient, more steadfast, better adapted to each other, than if their construction was just completed, that all depreciation has been offset by appreciation, and that values to the amounts here allowed by the master have been added to the values of these properties new, by their age, their repairs, their renewals, their adaptation, and the assured efficiency that comes from constant careful maintenance and operation. There was no error in these allowances.

Many other exceptions were taken to items which constitute parts of the values found by the master. Each one of them has been examined in the light of the evidence, the arguments, and the briefs. They challenge matters less important than those that have been reviewed, and no good purpose would be served by stating and discussing them in detail. Suffice it to say that none of these exceptions is sustained by the record, and the result is that the findings of the values of the Minnesota properties of the three companies by the master must be confirmed.

The master divided the values of the Minnesota properties between freight business and passenger business and between interstate business

and intrastate business on the basis of the respective gross earnings of these classes of business. Counsel for the defendants challenge this basis of division, and contend that the apportionment should have been made on the basis of the use made of the property by each of these classes of business, measured either (1) by the aggregate number of the ton miles and passenger miles of the respective classes, or (2) by the aggregate number of the car miles and engine miles of these classes. They say that if that proportion of the value of the property of a company which the number of ton miles hauled by it in Minnesota bears to the aggregate of its ton miles and passenger miles in Minnesota be assigned to its freight business, and that proportion which its number of passenger miles bears to the same aggregate be assigned to the passenger business, and if that proportion of the value thus assigned to the freight business which the aggregate of the car miles and engine miles appertaining to the intrastate freight business bears to the car miles and engine miles used in the freight business be assigned to the intrastate freight business, and the same method be pursued in apportioning value to the intrastate passenger business the apportionment will be more equitable and just. The issue is between apportionment by use without regard to the worth or value of the use and apportionment according to the value of the use. The latter basis seems to be more logical and rational. Capitalization is founded on the worth of use, not on mere use. The value of property and of investment in every form is measured by the value of its use, not by its use divorced from the value thereof. The Minnesota Railroad Commission, the railroad companies, all rate makers, base their rates primarily on the worth of the use of the railroad machines by the various classes of freight and by the passengers, and not on the amount of that use. The rate for hauling a ton of merchandise of the first class a mile is not five times the rate for hauling a ton of merchandise of class 1¾ a mile, because the former ton mile uses the railroad property five times as much as the latter, but because the use by the former is worth more than the use by the latter. Moreover, there is no unit of measurement of ton miles and passenger miles, of freight car miles and freight engine miles, or of passenger car miles and passenger engine miles, divorced from the values of the uses they make of the railroad property, from the classes of loads they carry and the distances these loads are hauled. Indeed, there is no proportioning or measuring relation between such varying uses of property, when no regard is given to the values of these uses.

On the other hand, the values of the uses, the earnings of the property, unavoidably condition the value of the property used, and present a natural and equitable basis of apportioning that value to these uses. Cases may indeed be imagined in which this basis does not produce persuasive results. One of them was suggested by Mr. Justice Brewer in Chicago, Milwaukee & St. Paul Ry. Co. v. Tompkins, 176 U. S. 167, 176, 20 Sup. Ct. 336, 44 L. Ed. 417, and others of like character have been presented in argument by counsel. But no basis has been suggested and none has been discovered which seems to be more equitable or more accurate. It may be that there is no basis or method that brings perfect or ideal results. But because the ton mile and

passenger mile basis has no common unit of measurement, because that basis and the car mile and engine mile and the passenger car mile and passenger engine mile bases exclude the effect of the values of the uses made of the railroad property by the various classes of freight and by the passengers carried, because there is really no proportioning relation between uses divorced from their values and the value of the property used, because these bases ignore the differences in the classes of freight carried and in the distances they are hauled, because the apportionment of the value of railroad property on the basis of the gross earnings of the classes of business, which disclose approximately the values of their uses of it, gives effect to these material differences, appeals more persuasively to the reason and produces results more equitable than any other basis suggested and because this basis has commended itself to the judgment of, and has been adopted by, the courts upon whom duties of apportionment of this nature have been imposed in like cases, the master was justified in following their decisions and his action and report in this regard is confirmed. Ames v. Union Pacific R. R. Co. (C. C.) 64 Fed. 165, 179; Chicago, Milwaukee & St. Paul Ry. Co. v. Tompkins (C. C.) 90 Fed. 363, 370; St. Louis & S. F. Ry. Co. v. Hadley (C. C.) 168 Fed. 317, 348–352; Northern Pacific Ry. Co. v. Keyes (C. C.) 91 Fed. 47, 56, 57; In re Arkansas Railroad Rates (C. C.) 163 Fed. 141, 142; Missouri, Kansas & Texas Ry. Co. v. Love (C. C.) 177 Fed. 493, 497.

In the cases of the Northern Pacific Company and the Great Northern Company exceptions are urged to the master's division of common cost between freight business and passenger business, to his finding that the cost of doing intrastate freight business was 2½ times the cost of doing interstate freight business, and to his finding that the cost of doing intrastate passenger business was 15 per cent. more than the cost of doing interstate passenger business. About 60 per cent. of the cost of doing the passenger and freight business in Minnesota consisted of items which in themselves disclosed the fact that they were incurred either in doing the passenger or in doing the freight business. All parties conceded that these items were properly assigned to the freight business and the passenger business, respectively, by the railroad companies, and these are termed "allocated items." The remaining 40 per cent. of the cost consisted of items incurred for the common benefit of the passenger business and the freight business, and there was no method of assigning these items that was certain to be mathematically and absolutely correct. Two methods were advocated by the respective parties to this controversy. The defendants introduced in evidence an allocation of these items made by Mr. Conway W. Hillman, an expert railway accountant, without extended experience as a railroad operator, whereby, in the Northern Pacific case, about $400,000 more common cost, and in the Great Northern case, about $900,000 more common cost, was assigned to the passenger business, and a correspondingly less amount to the freight business, than was assigned by the companies and confirmed by the master. This division was supported by the testimony of Mr. Hillman that in his opinion it was right and reasonable and by his statement of his reasons for this belief. But no other witness came to support his

view.   On the other hand, a large number of witnesses, who had long been familiar with the details of the expense of operating railroads, who had enjoyed a long experience in their actual operation, and who had considered in the light of their knowledge and experience and formed opinions concerning a just division of this common cost, testified that the allocation made by the companies and finally adopted by the master was fair and just.   This testimony was buttressed by evidence that this basis of division had been used by these and other railroad companies for their own information and convenience for some time before the questions here at issue had arisen, and that it had at one time received the approval of the Interstate Commerce Commission.   So it is that whether the knowledge, experience, and opportunities of the witnesses to form correct judgments upon this issue or their numbers be considered, the great preponderance of the evidence sustains the division made by the master, and it must stand.

All admit that the cost of doing intrastate business exceeds the cost of doing interstate business, and the issue is, how much does the cost of doing the former exceed the cost of doing the latter?   Upon that issue many hundreds of printed pages, a mass of evidence too vast for recital or review, has been examined and considered by the master and the court.   The evidence for the state consists of the testimony of Mr. Hillman, and the evidence for the complainants is the testimony of six men who have long been engaged in and are familiar with the actual operation of railroads and the expenses thereof.   Many criticisms of the testimony of each of these witnesses, of their opinions, and of the reasons they give for them, have been made by counsel for the respective parties, and have been the subjects of study and reflection in the light of the evidence and the arguments.   Mr. Hillman's conclusion in the Northern Pacific case, and it was similar in the other cases, was that the cost per ton per mile of doing intrastate business was about 44 per cent. more than the cost of doing interstate business.   Starting with the cost of doing business which was entirely local upon certain branch lines of the company, a cost which he extracted from its records, and with the assumption that the cost per ton per mile of doing the local business on the main lines of the company was the same as it was on the branch lines, he derived this result from these premises, from other records and reports of the company, and from a long and intricate series of computations, assumptions, and deductions.   No chain, however, is stronger than its weakest link, and an examination of the method he pursued and the bases upon which he founded his conclusion has convinced that the result he deduced is conditioned by so many of his own opinions and assumptions, unsupported by other persuasive proof, that his conclusion is entitled to no more weight than his opinion that it and the means by which he reached it are correct.

Many witnesses, however, whose evidence disclosed the facts that they had long been engaged in the actual operation of railroads, that they had learned and knew from actual observation and experience the conditions which increased and diminished the cost of the transportation of freight, and the relative effect of these conditions upon the cost of interstate and intrastate transportation, that they were

familiar with the details of the relative expenses of doing intrastate and interstate freight business, witnesses whose opinions are certainly as likely to be sound as that of Mr. Hillman, came and testified that, while they had no means of accurately and mathematically determining the fact, they were confident in the opinion that the cost per ton per mile of doing intrastate freight business was from three to six times the cost per ton per mile of doing interstate business. Counsel for the defendants say that a portion of local business is interstate business and takes a short haul, and a portion of through business is intrastate business and takes a long haul, and that the effect of the testimony of these witnesses is not that the cost per ton per mile of intrastate freight business is from three to six times the cost of intertate freight business, but merely that the cost of local and short-haul business bears that relation to the cost of through and long-haul business. The testimony of these witnesses has been considered in view of this criticism, but the record does not seem to sustain the contention of counsel. For example, Mr. Elliott says that the average haul of intrastate freight in Minnesota on the Northern Pacific Railroad was about 104 miles, that the average haul of interstate freight touching Minnesota on that railroad was about 485 miles, that the expense of short hauls is much greater than that of long hauls, and after enumerating various other reasons he testified that these reasons "all lead me to the conclusion that the so-called short-haul intrastate business costs anywhere from three to six or seven times as much as the so-called long-haul, through interstate business." On his redirect examination he was asked if by the statement which has just been quoted he meant "to compare the average cost of the state business with the average cost of the interstate business," and his answer was, "That was my intention in making that statement in my direct examination last week." Mr. Doddridge testified in the Great Northern case that his judgment was that upon the basis of ten miles, excluding the Missabe ore traffic, the ratio of extra cost per ton per mile of intrastate Minnesota freight was at least three times, and maybe four times, as great as that of interstate freight. True, much was said in the testimony of these and other witnesses of the extra cost of short hauls over long hauls, and of local business over through business, for the witnesses had in mind that a larger proportion of the interstate freight than of the intrastate freight was through business and took the long hauls; hence the terms "local freight" and "local business" appear to have been frequently used in this case and in other cases of this character to mean intrastate freight and intrastate business. But, when all the testimony of each of the six witnesses for the complainants upon this issue is considered together, it is persuasive that their testimony clearly discloses their opinions that the cost per ton per mile of the intrastate freight business of the two companies in Minnesota was from three to six times the cost of their interstate freight business in that state. The testimony of Mr. Hillman on behalf of the defendants falls far short of prevailing over this evidence, and the exceptions to the finding of the master that the cost of the Minnesota intrastate freight business of the companies per ton per mile was at least 2½ times that of the interstate freight business must be overruled.

For similar reasons the master's finding that the cost of intrastate passenger business per passenger mile was 15 per cent. more than that of interstate passenger business is confirmed. Missouri, Kansas & Texas Ry. Co. v. Love (C. C.) 177 Fed. 493, 499; In re Arkansas R. R. Rates (C. C.) 163 Fed. 141, 142; Chicago, Mil. & St. P. Ry. Co. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417; Minneapolis & St. L. R. R. Co. v. Minnesota, 186 U. S. 257, 262, 22 Sup. Ct. 900, 46 L. Ed. 1151; Ames v. Union Pacific R. R. Co. (C. C.) 64 Fed. 165, 184; Northern Pac. R. R. Co. v. Keyes (C. C.) 91 Fed. 47, 54; St. Louis & S. F. R. R. Co. v. Hadley (C. C.) 168 Fed. 317, 348. The master did not rest his final conclusions on this relatively greater cost of intrastate business per ton per mile without a careful consideration and credit to the intrastate business of the relatively greater revenue per ton per mile derived from that business, thus reducing the percentage for the freight business in the Northern Pacific case, for instance, from 250 per cent. to 173+ per cent., and for passenger business from 115 per cent. to 113+ per cent.

Complaint is made that the master finds that the companies are entitled to a net return of 7 per cent. per annum upon the respective values of their properties devoted to this public use. The character of the business in which an investment is made, the locality in which it is placed, the returns secured in that locality from other investments of a similar nature, the uniformity and certainty of the return, and the risks to which the principal and the income from it are subjected condition the measure of a fair return upon capital invested. An investment in a bank, in a factory, in a mercantile, manufacturing, or agricultural business, is substantially free from regulation by the government and exempt from any duty to the public, except that of paying taxes. If the business in which such an investment is made is unprofitable, its owners may promptly discontinue its operation until more prosperous days come and then return to their undertaking. An investment in a railroad which operates in many states is subject to the regulation of its business by many governments. Its owners owe the duty to the governments and to the public to operate their railroad continually in days when its operation is unprofitable as well as when it is remunerative, a duty they must discharge under the penalty of the forfeiture of their property if they fail. In view of these facts, they ought to be permitted to receive a return large enough to enable them to accumulate in prosperous days a surplus sufficient to enable them to protect their property in days of disaster and to make their average return through days of prosperity and of adversity fair and just. The lands in Minnesota through which these railroads extend are fertile and productive. The cities, villages, and towns they reach are rapidly increasing in population and wealth, and the people they serve are thriving and successful. The evidence satisfies that the railroads are maintained in excellent condition, that they are efficiently and on the whole economically managed and operated, and are rendering commendable service. Justice to the thriving people they serve does not require that the owners of these railroad properties should be deprived of a fair return upon their values.

To deprive them of such a return would prevent advances and tend to compel reductions in the wages and salaries of their employés, would tend to prevent the extension of their lines into portions of the state where the development and accommodation that railroad service assures would be welcome and may be needed, to deteriorate the character of the service they render, and to retard the general prosperity. The legal rate of interest on a debt in Minnesota, in the absence of contract, is 6 per cent., and by contract it may be 10 per cent. per annum. Rev. Laws Minn. 1905, § 2733. Rational investments in agricultural, manufacturing, mercantile, and other industrial pursuits, and even well-secured loans, yield returns in Minnesota corresponding with these lawful rates. Investments in railroads and the returns thereon are at the risk of failures and partial failures of crops, of the disasters, delays, and expenses of unusual storms, snow, and cold, of the great financial disasters which occasionally prevent or delay the movement of traffic, and of the burden of continuous operation whether profitable or unremunerative. It is an axiom in economics that the greater the risk the greater must the return be upon invested capital, and the conclusion is irresistible that a net return of 7 per cent. per annum upon the respective values of the properties of these companies in Minnesota devoted to transportation is not more than the fair return to which they are entitled under the Constitution of the United States.

Other exceptions were taken by the defendants, but they must be overruled, because they are not of the controlling character of those that have been discussed, and they are not sustained by the record. For the same reasons, the exceptions of the complainants must share a like fate.

The findings of the master must be confirmed. The fares and rates prescribed by the acts of the Legislature and the orders of the Railroad and Warehouse Commission which have been considered, have been, are, and will be, as to each of these railroad companies, unreasonably low, unjust, and confiscatory. Each of those acts and orders is violative of the fourteenth amendment to the Constitution, and void, and a decree for the complainant must be rendered in each of the cases.

It is so ordered.